## BRUMBELOW *v.* HOPKINS *et al.*

No. 14762. FEBRUARY 8, 1944.

*J. V. Poole,* and *E. A. Wright,* for plaintiff in error.

*H. A. Allen, G. B. Walker,* and *W. E. Spence,* contra.

GRICE, Justice. ■ The ground of the caveat based on the allegation that the alleged testator was suffering from monomania, in that he believed the caveators had mistreated him, was not, in our judgment, supported by any of the proof submitted. There is evidence to the effect that the older children, the caveators, when their father was about to sell his real estate, signed some kind of a petition to prevent him from doing so, but that their purpose was abandoned, no court proceeding being filed; that their object was merely to protect their father, in his old age, from dissipating his property, there being no need for him to sell it; that their conduct was praiseworthy and disinterested, and did not amount to mistreatment of their father; and that he, on learning of their contemplated plan, was hurt with them. Proof of these facts, however, was insufficient to show that the instrument sought to be propounded was the result of monomania. The mere dislike of certain persons causing their exclusion from the will does not in-

volve monomania. *Wynne* v. *Harrell,* 133 *Ga.* 616 (66 S. E. 921). Monomania means a mental disease, not merely the unreasonable conduct of a sane person. *Dibble* v. *Currier,* 142 *Ga.* 855 (83 S. E. 949, Ann. Cas. 1916C, 1).

Monomania exists whenever a person conceives something to exist which has no existence whatever, and is incapable of being permanently reasoned out of that conception. *Stephens* v. *Bonner,* 174 *Ga.* 128 (162 S. E. 383). In *Bohler* v. *Hicks,* 120 *Ga.* 800, 803 (48 S. E. 306), it was said: "Monomania can not be implied because a person takes a narrow or prejudiced, or utterly illogical view of a particular subject. Schoul. Wills (3d ed.), § 162; *Carter* v. *Dixon,* 69 *Ga.* 90. It is not the result of any conclusion; the person does not arrive at his conviction because of any attempt either at reasoning or investigation; the partial insanity is the offspring of a disordered intellect." Farther in the opinion in that case it was observed: "'Where a person is induced by false evidence or by false statements to believe a fact to exist, or where, in consequence of his faith in evidence which is true, but which is wholly insufficient to prove the truth of what he believes, he believes a fact to exist which in reality has no existence, his belief may show want of discernment, or that he lacks ordinary power of discrimination, and is consequently easily duped, but not that his mind is unsound.' [Middleditch *v.* Williams, 4 L. R. A. 738 (6)]. And see authorities cited in note to that case. An insane delusion does not mean a mistaken conclusion from a given state of facts, nor a mistaken belief as to the existence of facts. An erroneous conclusion of a sane person may arise from incorrect reasoning or from a deduction from information which he supposed to be correct." Measured by the foregoing principles, it must be held that it was erroneous to charge the jury on this subject.

In support of the ground which asserted that the testator was not, at the time of making the pretended will, of sound and disposing mind and memory, and was mentally incapable of making a will, the caveators introduced a number of non-expert witnesses who gave it as their opinion that his mind was unsound, and related many circumstances as the bases for their opinions. From this testimony the jury was authorized to believe that the alleged testator, after the death of his wife, was a different kind of a per-

son; that having theretofore been an active church worker, a devoted church member, a constant attendant upon religious services, his entire attitude as to such matters changed, he having either "fallen from grace," or "back-slided," according to one or the other of the theological viewpoints; that during his wife's illness he did several things that are difficult to harmonize with his previous affectionate and thoughtful treatment of his wife; that he acted peculiarly in a number of ways; that with $1500 of his own money in his pocket, without any apparent good reason, he borrowed from one bank $250 and from another $300; that his conversation was almost always on the subject of getting married again; that in buying candy the stripe had to run a certain way and be a certain size; that he made a spectacle of himself by appearing at church services one day dressed in a peculiar way and acted fantastically, to the mortification of certain members of his family who were present; that he was childish, and frequently "talked foolishness;" that part of the time he appeared to be out of his mind, one witness testifying that, "he would talk things that a reasonable man would not talk. His talk was about women mainly. He was just crazy or something." Another witness swore: "I noticed some difference in the manner of his talk or conversation after and before my mother died. If we started to talk about crops or anything to him, he would say a word or two and then be off on some other subject that was not even connected with that at all. Most of the subjects he brought in would be talk about some woman. That was about the biggest subject he had. He constantly talked to me about women when I would see him after my mother died." There is nothing in the testimony taken as a whole, including that of the physician quoted in the preceding statement of facts, to support a finding that when the will was executed Mr. Brumbelow did not possess testamentary capacity. It was therefore erroneous to submit that issue to the jury, as complained of in one of the special grounds. See *Orr* v. *Blalock*, 195 *Ga.* 863 (25 S. E. 2d, 668); Code, §§ 113-202; 113-205. For a recent collection of the cases, see *Scott* v. *Gibson*, 194 *Ga.* 503 (22 S. E. 2d, 51).

■ The remaining special ground presents the contention that there was no evidence to authorize the submission to the jury of the issue of undue influence. It is recognized that evidence which

does no more than show an opportunity to influence falls short of showing the exercise of undue influence. *Orr* v. *Blalock,* supra. Nor would honest persuasion or intercession to procure the will to be made in his favor amount to undue influence on the part of a legatee. *Ward* v. *Morris,* 153 *Ga.* 421 (112 S. E. 719). Although "undue influence exercised prior to execution of the paper may continue to operate on the mind of the testator until the paper is actually executed; and if [upon?] account thereof the testator executes a paper in which the will of the person exercising the influence is substituted for that of the testator, the paper will be void, though the influence commenced at an antecedent date" (*Trust Company of Georgia* v. *Ivey,* 178 *Ga.* 629, 641, 173 S. E. 648), yet to be sufficient to invalidate the will it must be operative on the mind of the testator at the time the will was executed. That the testator was an old man, that he disinherited all of his children except the propounder, that he became unfriendly with his other children amounting to an estrangement, would be insufficient to show such influence over the mind of the testator as would invalidate the will. Compare *Edenfield* v. *Boyd,* 143 *Ga.* 95, 96 (3 *a*) (84 S. E. 436). In *Dean* v. *Littleton,* 161 *Ga.* 651 (131 S. E. 507), a charge of the trial court was approved, which instructed the jury as follows: "No precise quantity of influence can be held to be necessary and sufficient in all cases, as the amount necessarily varies with the circumstances of each case, and especially does it vary accordingly as the strength or weakness of mind of each testator varies, the amount of influence necessary to dominate a mind impaired by age, disease, or dissipation being decidedly less than that required to control a strong mind." Again, in that case, approval was given to the following charge: "Influence over a testator of one who occupies some confidential relation to him is not necessarily undue influence, although it may cause the court and jury to examine the case with greater scrutiny, and may, when coupled with other circumstances, raise a presumption of undue influence; but the question must be determined, as in all other cases, by ascertaining whether the free agency of a testator has been destroyed." Undue influence in procuring a will may exist in many forms, and it may be operated through diverse channels. The existence and effective power of undue influence is not always susceptible of direct proof. It may

be proved by circumstantial evidence. *Davis* v. *Frederick,* 155 *Ga.* 809, 817 (118 S. E. 206); *Cook* v. *Washington,* 166 *Ga.* 329, 356 (143 S. E. 409); *Stephens* v. *Bonner,* supra; *Peretzman* v. *Simon,* 185 *Ga.* 681, 686 (196 S. E. 471). Since it seldom can be shown except by circumstantial evidence, including the surroundings of the testator and his associations with the person charged with exercising the undue influence, it is proper on an issue of this kind to consider the testator's dealings and associations with the beneficiary of his bounty; his habits, motives, feelings; his strength or weakness of character; the reasonableness or unreasonableness of the will; his mental and physical condition at the time the will was made; his manner and conduct; and generally every fact which will throw any light on the issue raised by the charge of undue influence. *Penniston* v. *Kerrigan,* 159 *Ga.* 345, 350 (125 S. E. 795).

Keeping these principles in mind, what must be the result where applied to the facts in the record before us? The relation between the alleged testator and the chief beneficiary under the alleged will was that of father and child. The alleged testator when he executed the instrument sought to be propounded was nearly eighty years old, with twelve living children. The propounder was the Benjamin of his old age. The father was a widower, and for several years, and until about the time the instrument in question was signed, lived alone. The propounder, who had theretofore lived elsewhere, moved into the house of the testator a few days after the date of the will. There was proof to the effect that the caveators, whom he practically disinherited, had been dutiful children, aiding him financially and otherwise; that the propounder and chief beneficiary under the writing sought to be propounded was much in the company of his father about the time the will was prepared, and shortly before his death, and also subsequently to the time that his children, other than the propounder, had conferred together in an effort to prevent their father from selling his property. According to the record, their purpose was to prevent him from doing what they conceived to be an unnecessary and foolish thing. They filed no court proceeding, nor followed up their opposition, because, according to the record, this would have exposed the mental condition of their father. When he went to the attorney for the purpose of having his will

drawn, he stated that these children had not treated him as he thought they should; that they had not come to see him after his wife died, but had left him in the country by himself; that in the fall he had been trying to sell some land, and they tried to break it up. He offered no other reason why he wished to give practically all of his property to "Bud." There is evidence in the record to justify the belief that his children had not neglected him, or refused to visit him. From the testimony of the caveators themselves the following facts may be gleaned: Their father mistreated and neglected their mother when she was sick, and refused to have a doctor because it was too expensive, he insisting, according to their testimony, that the doctor could do nothing for her; and after their mother's death, they reminded him of his unseemly conduct, and told him what other people were saying about him. When a part of his land was being advertised for sale—all but the home place and some forty years—the nine caveators, children of the old man, signed a petition to enjoin him from selling, and their conduct offended their father to such an extent that he said to one or more of them that he did not want any of the children who signed that petition to come in his yard again. When some of them mentioned to him about the birthday party to be held at his son George's, and asked him if he was coming, he replied, "No;" and when pressed for a reason, he said that Bud said he had better not go down there, they did not care for him. Bud and his wife were with their father most of the time, Bud's wife driving him in his car. The doctor who attended both Mr. and Mrs. Brumbelow when they were sick testified to the effect that Bud or his wife was with the old man every time the doctor visited him after his wife died; that Bud lived in a house of his own near to and adjoining his father's place; that on December 14, 1940, Bud and his wife moved into the father's home, and continued to look after him until he died. A son-in-law of the testator testified that he did not know whether Mr. Brumbelow's children went to visit him much after his wife died, though, as the witness stated, he lived just a mile away; that Bud told two of the caveators that he was going to have his father make a will, and told one of them: "Papa says he could see how years ago he didn't make a will, and he is going to see if he could make one." Also, a witness sworn for the caveators testified: "He [the testator] talked to me

about the land sale and his children; he thought his children were trying to sell his home from under him. He just said they stopped him from selling his land. I mean his children; that was his children, and it hurt his feelings, and he cried. I reckon that is why he was crying. . . The last time he was here and cried was when he showed me the will, and I read it and handed it back to him, and I said, 'Why did you make it,' and he cried. He seemed to be upset."

None of the testimony shows undue influence on the part of Bud in getting his father to make the will, especially in view of the fact that when the old man went to a lawyer's office to get him to draw up his will, he was accompanied by only one person, a man not related to any of the Brumbelows; and that when he returned to the lawyer's office some days later to sign the will, he came' there alone and signed the will in the presence of three witnesses whom he found there. Therefore it was error for the court to submit the question of undue influence to the jury without sufficient evidence to authorize a charge on that subject.

■ Two juries have found for the caveators. There is always a presumption that the finding of a jury is correct. A second verdict in favor of the same party increases the strength of this presumption; and the reluctance with which a reviewing court renders a judgment in effect setting aside the conclusion reached by the triors of fact is likewise stronger after two concurrent verdicts. But "a second verdict, found with no evidence to sustain it, should be set aside as readily as a first one." *Wood* v. *Lane,* 102 *Ga.* 199 (29 S. E.180). This language is quoted from an opinion prepared by Mr. Chief Justice Simmons in a case where a jury for the second time had found against the will of a man who was in feeble health, who had been confined to his room and bed for seventeen years, whose recollection frequently failed him, and whose mind was not strong. The right to make a will is a valuable right, and was recognized in the elemental dawn of recorded history. Wills were in use among the ancient Hebrews. Genesis, Chapters 15 and 48; Blackstone's Commentaries, Book 2, Ch. 32; also see 1 Page on Wills (Lifetime edition), Sec. 7. It is a serious thing to deprive a person of this power of bequeathing, to set aside an act so solemn. Especially is this true when in his declining years the right to control the disposition of his property might constitute

the only means of providing for his care and sustenance, when old age or feebleness has deprived him of his capacity to earn a livelihood by his own efforts. Even an elderly person, if possessed of testamentary capacity, has the right, if exercised freely and voluntarily in the manner pointed out by law, to make provision for the disposition of his property after his death; and if otherwise legal, this right can not be taken away from him, notwithstanding it might appear in a particular case that his will was not the kind the jurors or judges believe they would have made under all the circumstances that surrounded him, had they been in his place. No one has the right to substitute his will for that of the testator. There is but one standard of justice which courts and jurors should follow, and that is, justice according to law. If any other standard were adopted, there would be no certainty and uniformity in the administration of justice. The result in each case would be determined by the varying criteria of those who undertook to administer justice. How impotent is the law if, instead of the measure it prescribes, each one who is charged with the duty of passing on the issue of devisavit vel non guages the case according to his own ideas of justice.

If the law declares—as it does—that an old, feeble man, peculiar and eccentric though he may be, shall not on that account be deprived of the right to make a will; if the law declares—as it does—that even a monomaniac may make a will, if the will is in no way the result of or connected with his monomania, and that the unreasonable conduct of a sane person can not be classed as monomania; if the law declares—as it does—that a charge of undue influence must be supported by testimony other than that which shows merely that a person who takes a substantial benefit under the will bore a confidential relationship to the testator, and had the opportunity to unduly influence him; if the law declares —as it does—that an instrument shall not be refused probate because the testator practically disinherited some of those who, in the absence of a will, would share in his estate, although his reasons therefor may not accord with the views of those who are charged with the duty of determining whether it shall be admitted to probate; if the law's standard be—as it is—as expressed in the Code, § 113-201, that "every person may make a will, unless laboring under some legal disability arising either from a want of

capacity, or a want of perfect liberty of action;" if the law's standard of intellect necessary to constitute testamentary capacity be—as it is—according to the Code, § 113-202, "that which is necessary to enable the party to have a decided and rational desire as to the disposition of his property;" if it be true, as stated in the Code, § 113-205, that "eccentricity of habit or thought does not deprive a person of the power of making a will; [that] old age and weakness of intellect resulting therefrom does not, of itself, constitute incapacity," then no one has the right, under the evidence before us, to deny probate to the instrument sought to be propounded, even though it fail to commend itself to those charged with administering the law as being a fair or just will. In the exercise of the duty resting upon us, it must be held that it was an error of law to refuse a new trial, since the verdict was not supported by the evidence.

*Judgment reversed. All the Justices concur.*