1. On the trial of an issue arising upon the propounding of a will and a caveat thereto, the burden, in the first instance, is on the propounder to make out a prima facie case, by showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and, in making it, acted freely and voluntarily.
2. Under the law and the evidence in the present case, a finding in favor of the will was demanded, and the court erred in overruling the motion for new trial.
 No. 15918. SEPTEMBER 6, 1947.
J. G. Spivey died on November 14, 1946, leaving a will which was executed on May 14, 1946, and which was offered for probate in solemn form by his son, L. C. Spivey. By the will the testator directed that all his property be reduced to cash, and then divided equally among his children, or their survivors. R. R. Spivey, a son, filed a caveat on the ground that the testator, at the time of making the pretended will, was not of sound and disposing mind and memory. From a judgment by the court of ordinary in favor of the propounder, the caveator appealed to the superior court, where the jury found in his favor. A motion for new trial was overruled, and the propounder excepted. The sole question presented is whether the evidence on the one issue of mental capacity was sufficient to authorize the verdict. *Page 645 
The evidence submitted on behalf of the propounder is hereafter referred to in the opinion.
The evidence for the caveator on the issue of mental capacity was, in substance, as follows: Dr. O. C. wood testified: "I knew Mr. J. G. Spivey. He was under my care as a physician several times. . . He was in the hospital about six times, the first time in September, 1943, then October, 1943, November, 1943, December 20, 1944, March, 1945, and October 29, 1946, and he died November 14, 1946. I don't think he came back to the hospital to consult with me more than two or three times between those dates. During these visits to the hospital and while he was under my care I had an opportunity to observe him as to his mental and physical condition. At no time did I ever see him when he was under my observation that I thought he was capable of transacting business. He gradually got worse. Taking into consideration the physical condition of Mr. Spivey, I doubt if his condition would improve, because his general condition was progressive and continued to get worse. Of course his condition would vary in some parts, with respect to his uremia, but as to hardening of the arteries and permanent mental deterioration, some days he was clearer than others and other days he would not know he was in the hospital. His condition continued to get worse from 1943, when I first saw him. At the time Mr. Spivey signed this will it had been 12 months since I had seen him, and he had not been back there except for an interim. He signed the will in May, 1946. The next time I saw him was October 29. I saw him in March, 1945, and did not see him any more until he came to the hospital when he died. . . Mr. Spivey's condition was largely due to old age. I would say, in my opinion Mr. Spivey was not competent on May 14, 1946. I don't know what amount of mental competence is necessary to qualify a man to make a will. I think his mental capacity should be such as to enable him to make a good contract. . . I am not attempting to say that a person would have to be capable of making a contract before he could make a will. I could not say that on May 14, 1946, Mr. Spivey was incapable of transacting any business, making a will or any other business — if it involved any responsibility, I would not think he would be able to do it. Mr. Spivey passed pus from time to time, which continued from the time I first saw him. That and his *Page 646 
age, the hardening of his arteries, kept his mental condition from getting any better . . . Mr. Spivey was not a mental case other than his mental condition was a complication of his medical condition. . . I did not have to give Mr. Spivey a mental test to know his mind was bad. I could see that from observation."
Dr. C. B. Fulgham testified: "I am a licensed and practicing physician and am a physician at the Baldwin Memorial Hospital. . . I knew Mr. Spivey in the hospital only. I passed him in the hall and occasionally spoke to him in his room. . . He was almost continually trying to engage anyone in conversation that would get in conversation with him. I spent most of my time dodging him. I saw him prior to May 14, 1946. . . I would see him on the dates Dr. Wood gave here as his being in the hospital. With reference to the date of March, 1945, I can say that at no time that I ever saw him was he, in my opinion, capable of transacting any business, to his advantage. His condition continued to get worse from the first time I saw him. In my opinion he got worse from month to month. I never examined him and am not qualified to say about his physical condition, but he did get worse. . . His physical condition on May 14, 1946, I would not know about; his mental condition was, I should consider, obvious on inspection. He was arterioschlerotic. . . His admission to the hospital was never caused by his physical condition. . . It is my opinion in large part it was necessitated by his mental condition."
W. J. Bell testified: "Occasionally I had an opportunity to talk to Mr. Spivey during 1946. . . I would average seeing Mr. Spivey once every two or three months in the last year or two. . . I noticed something unusual about him. The reason why I noticed it, we were always such close friends; during the last year or two of his life it looked like he was distant, would not talk to me as he used to. He would recognize me." On one occasion, in the fall of 1945, Mr. Spivey abused his grandson. "He said, `I told you not to do that,' and said, `I will knock you in the head if you don't pay any attention to me.' Mr. Spivey was to some extent impulsive, but I had never heard him talk that way to his grandson before. . . I would consider his mind less active than it had been. . . I would not say Mr. Spivey has been impulsive more than a normal man would be. He was a pretty strict man *Page 647 
about things he wanted to do up to a certain time, and after that his mind was considerably weaker than it was previously. That would be two or three years before he died. I could see a difference in him, even his attitude towards me."
Frank Spivey testified: "I was a grandson of Mr. J. G. Spivey. I saw him every day during 1945 and 1946. I was living out in the country with him. I stayed in the room with him. He usually had the habit of going to bed at 11 or 12 at night. Once in the day time I went in the room around dinner. He was getting ready to go to bed. I asked him, didn't he feel all right. He said `No, it was time to go to bed.' He figured it was night and I tried to explain to him and he got mad with me. He lived on the place there 80 years and got lost on his own place, in sight of the house where he lived all his life. I noticed him on May 14, 1946. The thing he got mad about that morning, usually when we went to work every morning he wanted to get up at that time, but he overslept that morning because nobody didn't wake him up. He got mad with everybody in the house because they didn't wake him up. His mind was sure bad on the date of May 14, 1946. . . To the best of my knowledge Mr. Spivey's mind was bad in 1946. I would say it has been bad for several years, since 1942, or 1943, or a little before."
W. D. Stribling testified that Mr. Spivey would come by his garage during 1945 and 1946 to catch a bus, but would not recognize him, and he would have to tell him who he was; that he didn't remember seeing Mr. Spivey on May 14, 1946, and didn't know anything about the condition of his mind on that day.
R. R. Spivey testified: "Mr. J. G. Spivey was my father. In the spring of 1945 he was sick, more mental than physical, and we took him to the hospital and his mind from then on continued to get worse. During the winter time I would have to watch him every night, when he was building his fire. . . One night he caught fire and my wife and myself had to go in and put him out. He came to breakfast several times in the morning, and we had to send him back to put on his clothes. He went off to the place where he married and was leaving, and the old negro walked up in the yard and he asked who lived there, and the negro took him and brought him back and put him in the public road and brought him home. . . He has threatened to kill me, started on me *Page 648 
with a poker three different times. He had a pistol in his drawer that I loaned him. I took it out. There is a door between my room and his. I saw that it was locked, and we were alert any time, we didn't know what he was going to do. On May 14, 1946, based on these things, I would say his mind was bad, that day and all days. He was not able to do anything and I had to stop him from doing some things that he was doing wrong and got legal advice and doctor's service. . . I looked after every bit of his business for him. He had found out a long time ago that he couldn't attend to business. . . He was in the hospital until April 1, 1945, when I brought him home and from then on his mind got worse and worse."
Dr. E. F. Griffith testified: "I practice here in Eatonton, I knew Mr. J. G. Spivey during his lifetime very well. I attended him off and on for about 30 years and was intimately familiar with his mental capacity. I did not see him on May 14, 1946, but from past knowledge of Mr. Spivey and his mental condition and the number of times I had seen him in the past two years, I would say that his mind was decidedly bad. I had been treating Mr. Spivey off and on for a number of years. In the past two years his condition was becoming progressively worse, so far as his mental and physical condition was concerned."
Dr. F. F. Middlebrooks testified: "I am a druggist. . . I knew Mr. J. G. Spivey very well during his life. I saw him in 1945 when he was in the Baldwin Memorial Hospital. I went to see him frequently and talked with him. I couldn't help but notice quite a gradual decline in his mental capacity from the previous years of our associations. He got to the point where he did not know me; I would have to impress on him our former relations. That was the year before he died in 1946. At that time when I saw him at the hospital, I would say his mind was bad. He had some very lucid moments, then he would be absolutely blank."
1. "Upon the trial of an issue arising upon the propounding of a will and a caveat thereto, the burden, in the first instance, is upon the propounder of the alleged will to make out a prima facie case by *Page 649 
showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and in making it, acted freely and voluntarily. When this is done the burden of proof shifts to the caveator."Slaughter v. Heath, 127 Ga. 747 (9) (57 S.E. 69, 27 L.R.A. (N.S.) 1); May v. May, 175 Ga. 693 (4) (165 S.E. 617). The caveator contends that there was no burden resting on him, and that a verdict in his favor was demanded because the propounder failed to make out a prima facie case by showing that at the time of execution of the alleged will the testator apparently had sufficient mental capacity to make it. This presents the question of what proof is necessary to establish a prima facie case on the issue of testamentary capacity.
Literally, the words, "prima facie," mean "at first view." A "prima facie case" may be defined as one in which the evidence in favor of a proposition is sufficient to support a finding in its favor, if the opponent produced no evidence, or if all the evidence to the contrary be disregarded.
To make out a prima facie case, and to be entitled to a judgment of probate in solemn form, the propounder must introduce at the hearing all the subscribing witnesses, if living and accessible, or proof of their signatures, if dead or inaccessible. Code, § 113-602. They must be introduced, for examination, even though the propounder knows that their testimony will be unfavorable to him. If some or all of the subscribing witnesses cannot testify as to the testamentary capacity and mental condition of the testator, or give testimony adverse to the propounder and favorable to the caveator, such failure of memory or hostility will not necessarily defeat the will. The propounder may make the proof required by law by other witnesses who can testify as to the essential facts, and upon sufficient proof being made the will may be probated. Huff v.Huff, 41 Ga. 696 (3); Gillis v. Gillis, 96 Ga. 1
(23 S.E. 107, 30 L.R.A. 143, 51 Am. St. R. 121); Wells v.Thompson, 140 Ga. 119 (78 S.E. 823, 47 L.R.A. (N.S.) 722, Ann. Cas. 1914C, 898); Bowen v. Neal, 136 Ga. 859
(72 S.E. 340); Crutchfield v. McCallie, 188 Ga. 833, 841
(5 S.E.2d 33). In Thompson v. Davitte, 59 Ga. 472, 475, Judge Bleckley, in considering the proof necessary to shift the burden to the caveator, said: "The truth is, that what the propounder have to carry, on *Page 650 
the score of sanity and freedom, is more in the nature of ballast than of cargo. It is just burden enough to sail with — no more." This rule was later quoted in Credille v. Credille, 123 Ga. 673
(51 S.E. 628, 107 Am. St. R. 157). And in Evans v.Arnold, 52 Ga. 169, 181, this court said: "Undoubtedly sanity is the normal condition of man, and if, on an examination of the circumstances attending the execution nothing unusual appear; if the testator appears to be aware of what he is doing, and acts as sane men do, I am of the opinion that a prima facie case is made out, at least that a verdict for the will would be justified, if, when the facts are detailed, the act as done is done as sane men do things — as if a man ask a witness to attest his will, and the witness do so on its being signed by the testator — the very act of signing, intelligently, is a sane act."
In the present case, the three subscribing witnesses to the will were introduced at the hearing and testified to the formalities of execution as required by law. two testified that the will was read to the testator in their presence; the third, that he thought it was read before he arrived. They testified that the testator signed the will freely and voluntarily, and stated to them that it was his will and what he wanted to do with his property. On the question of mental capacity to make the will, J. M. Gregory, one of those subscribing, testified that he talked with Mr. Spivey for twenty or twenty-five minutes before the other witnesses arrived, and that he mentioned and talked about several things and told them like they were. "With reference to whether Mr. Spivey was at the time he signed that will of disposing mind and memory, he seemed to know what he was talking about." P. C. Rossee, a subscribing witness, testified: "I think Mr. Spivey was in sound and disposing mind that day, so far as I knew. He seemed to be rational." This witness also testified: that Mr. Spivey would leave money with him at the store and would later come or send back for part of it to pay his bills; that, after the will was executed. Mr. Spivey would occasionally come by the store to make purchases, and always seemed to know just what he wanted; that Mr. Spivey kept up with this money and always knew just how much he had at the store; that he didn't notice any particular change in Mr. Spivey the day he signed the will, except that he seemed to be a little older. John D. Watterson, the other subscribing witness, *Page 651 
testified: that he could not say whether he thought Mr. Spivey was of a sound and disposing mind at the time he signed the will; that he was in a bad physical shape and talked very little; and that he would have witnessed the will regardless of the condition of the testator. In rebuttal, the propounder introduced two other witnesses who testified to the general mental condition of the testator during 1946.
The positive testimony of the three subscribing witnesses that the testator signed the will freely and voluntarily and after stating that it was his will and what he wanted to do with his property, and the positive testimony of two of the subscribing witnesses that the testator was apparently of a sound and disposing mind at the time he executed the will, was sufficient to establish a prima facie case on the issue of mental capacity, and would be sufficient to support a verdict in favor of the propounder in the absence of other evidence. There is no positive evidence, on the propounder's side, to the contrary. The contention of the caveator on this issue is therefore without merit.
2. Was there any evidence to show that the testator was not of sound and disposing mind and memory at the time the will wasexecuted, and to authorize the verdict sustaining the caveat?
For the statutory rules on determining testamentary capacity, see the Code, §§ 113-201, 113-202, 113-204, 113-205. In accordance with these statutory provisions, it has been held by this court: "A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property to take effect after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and of affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." Slaughter v. Heath, supra. "Decided" simply means a mental capacity to frame a desire that is certain, or with distinct limits, and "rational" means that the desire must be consistent with reason. Hill v. Deal,185 Ga. 42, 46 (193 S.E. 858). In Gardner v. Lamback, 47 Ga. 133,193, this court held: "To make one incapable of making a will from insanity . . there must be a *Page 652 
`total deprivation of reason.' However old, feeble, weak-minded, capricious, notionate he may be, if he `be able to have a decided and rational desire as to the disposition of his property,' he is not wanting in testamentary capacity. And in making the inquiry, it would seem from the very words of the Code that attention is to be given, not so much to the state of the mind as an abstract philosophical or medical question, as to its capacity for the precise thing in hand. For a man may say and do things which a medical man would take as evidence of insanity, and yet it may be that he is nevertheless able to have a decided rational desire as to the disposition of his property." Although evidence as to the mental capacity at a time prior or subsequently to the execution of the will may be shown to illustrate the condition of the testator's mind, still the controlling question to be determined, where testamentary capacity is the issue, is whether the testator had sufficient testamentary capacity at the time of executing the will. Terry v. Buffington, 11 Ga. 337 (56 Am. D. 423);Brown v. Kendrick, 163 Ga. 149, 168 (135 S.E. 721);Hillyer v. Ellis, 171 Ga. 300 (155 S.E. 180); Fehn v.Shaw, 199 Ga. 747, 754 (35 S.E.2d 253).
To sustain the verdict refusing probate, the caveator relied on the testimony of three expert and five non-expert witnesses. None of the three physicians saw the testator on the day when the will was executed. Dr. Wood, the principal expert witness, who attended the testator in his last years, did not see him between March, 1945, and October, 1946 — a period of about one year prior to the date of the will and about six months after. Dr. Fulgham did not see him during the same period. Only one non-expert witness testified that he saw the testator on May 14, 1946. The expert testimony was, in general, that the testator's mental condition was "largely due to old age." Dr. Wood testified: "I would say, in my opinion Mr. Spivey was not competent on May 14, 1946. I don't know what amount of mental competent is necessary to qualify a man to make a will." On redirect examination, he testified: "I could not say that on May 14, 1946, Mr. Spivey was incapable of transacting any business, making a will, or any other business — if it was anything that involved any responsibility, I would not think he would be able to do it." Dr. Fulgham testified that he never saw Mr. Spivey when he thought him "capable of transacting business to his advantage." Dr. Griffith testified that *Page 653 
"his mind was decidedly bad," based on past knowledge of Mr. Spivey and his mental condition. No expert testified that Mr. Spivey was at any time "totally bereft of reason." See Griffin
v. Barrett, 183 Ga. 152 (187 S.E.2d 828). The non-expert testimony most favorable to the caveator was as follows: W. J. Bell — "I would consider his mind less active than it had been." W. D. Stribling — Mr. Spivey would not recognize him in 1945 and 1946, and he would have to tell him who he was. Dr. Middlebrooks, a druggist — Mr. Spivey's mind was bad when he saw him in the hospital in 1945. He had some very lucid moments, then would be absolutely blank. R. R. Spivey — basing his testimony on the fact that the testator had threatened to kill him, once got lost on the place where he was married, once caught his clothes on fire, had to be sent from breakfast several times to put on clothes, and was unable to care for his business — testified that his mind was bad on May 14, 1946, "that day and all days." Frank Spivey noticed Mr. Spivey on May 14, 1946, and his mind was bad that day, and had been for several years prior thereto. This opinion was based on the fact that the testator, once thinking it was nighttime, started to bed around noon, and once got lost on his home place. There was no testimony, by expert or non-expert witnesses, which would have authorized the jury to find that the testator did not possess sufficient mental capacity to "enable him to have a decided and rational desire as to the disposition of his property."
The evidence produced by the caveator on the hearing of this case was no more sufficient to show testamentary incapacity and to authorize a verdict in his favor than that dealt with by this court in several cases in which the judgments denying probate were reversed. In Orr v. Blalock, 195 Ga. 863
(25 S.E.2d 668), the caveator offered a number of non-expert witnesses who testified to having seen the testator at various times before and after the will was executed, but none who saw him when the will was actually signed, and who testified that when they saw him, he was mentally incapable of having a rational desire as to the disposition of his property. In Scott v. Gibson, 194 Ga. 503
(22 S.E.2d 51), a witness testified: "When I come home she was washing clothes, and she said she felt bad, and come over and fell down on the porch, and she was sick from then until she died. She was in a bad condition when the women carried her in the house. She continued *Page 654 
to grow worse so that she did not know what she was doing. . . I saw her daily and she grew steadily worse day by day. I would speak to her every day and she did not answer, but only lay in bed. I saw her daily from the time she got ill until she died, and during that period she was not in a condition to know what she was doing." The court said: "Such testimony can not break down the positive testimony of the subscribing witnesses at thetime the will was executed." (Italics by the court.) InBrumbelow v. Hopkins, 197 Ga. 247 (29 S.E.2d 42), the will was executed December 7, 1940. A physician who examined the testator on December 5, 1940, testified: "I did not give him the health certificate, because his blood pressure was too high and he had arteriosclerosis, hardening of the arteries. . . The arteriosclerosis that he had was pretty bad. . . I talked with him. I would say that his mind was not good either time he visited my office." A number of non-expert witnesses were introduced, who gave it as their opinion that the testator's mind was unsound, and related many circumstances as the basis for their opinions. The court held that lack of testamentary capacity was not shown by the non-expert witnesses, whose opinions that the mind of the testator was unsound were not based on circumstances to authorize such conclusion; and that the testimony of the physician failed to show the lack of mental capacity necessary for the thing at hand, to wit, the making of a will. In Peavy v. Crawford, 192 Ga. 371 (15 S.E.2d 418), a witness testified: "Having known Mrs. Crawford before, and observing her at that time, she was not capable of disposing of her property. I don't believe she recognized what she was doing at that time." (Witness referred to the day the will was signed.) "Mrs. Crawford did not recognize me . . the day before, and didn't recognize me after that until about a week afterward. At that time she was very ill. I spoke to her when I went in the room, but she didn't reply — didn't say anything at all to me. She was just lying there, and sometimes she didn't speak at all." The court said: "The witness was in the room only a part of the time. She testified to no conversation with the testatrix, and gave no facts on which to base her opinion that Mrs. Crawford was not capable of disposing of her property. Such testimony can not break down the positive testimony of the subscribing witnesses that, at the time the will was executed, the testatrix was capable of making a testamentary *Page 655 
disposition of her property. See Hillyer v. Ellis, 171 Ga. 300
(155 S.E. 180); Hill v. Deal, 185 Ga. 42
(193 S.E. 858). The evidence demanded the verdict." For similar reversals, see Griffin v. Barrett, supra; Martin v. Martin,185 Ga. 349 (195 S.E. 159); Dutton v. Nash, 186 Ga. 292
(197 S.E. 637). For cases in which this court has affirmed the direction of a verdict in favor of the propounder when testamentary capacity of the testator was in issue, see Walters
v. Walters, 151 Ga. 527 (107 S.E. 492); Mason v. Taylor,162 Ga. 149 (132 S.E. 893); Cook v. Washington, 166 Ga. 329
(143 S.E. 409); Fehn v. Shaw, supra.
The mind of the testator could have been "bad," or such that he could not "transact business to his advantage," and still he could have possessed sufficient intelligence to enable him to have a "decided and rational desire as to the disposition of his property." The opinions of the non-expert witnesses that the mind of the testator was "bad" were not based on such facts and circumstances as to authorize the conclusion that he was totally devoid of the capacity to have a "decided and rational desire as to the disposition of his property." The test is whether he had such mental capacity at the time the will was actually executed. The testimony of both the expert and non-expert witnesses was insufficient to overcome the positive testimony of two of the subscribing witnesses that at the time the will was executed
the testator apparently had testamentary capacity. The evidence therefore demanded a verdict in favor of the propounder, and the trial court erred in denying the motion for new trial.
Judgment reversed. All the Justices concur, except Jenkins,C. J., not participating on account of what appears to be anactual or moral, though not technical, disqualification, andWyatt, J., who took no part in the consideration or decision ofthis case.