NORMAN *et al. v.* HUBBARD *et al.*

No. 16125. APRIL 14, 1948.

*Z. B. Rogers* and *J. T. Sisk,* for plaintiffs in error.
*Raymonde Stapleton* and *Howard B. Payne,* contra.

HEAD, Justice.   Miss Fannie Carter and Mrs. Janie Hubbard sought to probate in solemn form the will of J. R. Norman, in the Court of Ordinary of Elbert County.   The petition named seven persons, first cousins of the decedent, as his closest relatives.   William T. Norman and others filed a caveat to the probate of the will on the grounds of lack of testamentary capacity in the decedent and undue influence exercised over him by the propounders   The case was appealed to the superior court, and after the evidence for both sides was closed, the court directed a verdict for the propounders.   The assignments of error by the caveators in their bill of exceptions in this court are to the direction of the verdict and to the overruling of their motion for new trial.   It is strongly urged that there was sufficient evidence to require the court to submit the issues to a jury.

The will sought to be propounded was executed on May 22, 1945.   The testator died on June 26, 1946.   By the terms of the will the propounders were appointed executrices of the will; O. C. Madden was bequeathed the sum of $1000; and the remainder of his property was devised and bequeathed to the propounders, with the statement "both of whom have been very faithful and attentive in caring for me and waiting on me in my declining years."

■ On the issue of testamentary capacity, the propounders introduced in evidence the testimony of the three subscribing witnesses, one of whom was the attorney who had drawn the will for the testator.   All three witnesses testified that they had talked with the testator on the occasion of the execution of the will, and from their conversation with him it was their opinion that his mind was perfectly normal.   The deposition of Dr. Jenkins, who had attended the testator for many years, and until the time that the physician became ill and unable to continue his practice, was introduced in evidence.   The physician testified that he had visited the testator on the date the will was executed, and that there was nothing wrong with the testator's mind at that time.

The caveators introduced a number of witnesses for the purpose of showing the mental incapacity of the testator.   J. W. Y. Vickery stated that he had been to see the testator some time

during the latter part of 1945, but was refused admittance to see him by Mrs. Hubbard, who told him that the testator "was sick and his mind was bad and he couldn't have any company." George Partain, a son of one of the caveators, testified that he did some work for the testator in the latter part of May or first of June, 1945. He stated: Mr. Norman did not seem to want to talk; he would sometimes reply to questions, and sometimes would not. He paid no attention to what the witness said to him. From the witness's conversations with Mr. Norman and efforts to talk to him, he could not say whether his mind was normal or not. He did not seem to the witness to be normal. R. A. Partain, a son of one of the caveators, saw Mr. Norman during the ginning season of 1945. Mr. Norman did not know him. When the witness told him who his mother and father were, Mr. Norman stated that they were kinfolks. G. P. Hall stated: He stopped at Mr. Norman's place some time in 1945 and Mr. Norman was standing by the well. Mr. Norman did not recognize the witness. The witness has since learned that there was something the matter with Mr. Norman's eyes. On one occasion the witness was at Clarence Oglesby's barn when Mr. Norman was there wanting to get a manure scatterer. Mr. Norman did not talk "with as much sense as he used to—not much, he was feeble. . . He had enough sense to tell Mr. Oglesby about a manure scatterer." Arthur Nelms testified that he had talked with Mr. Norman about a year or eighteen months before he died. A part of his testimony is as follows: "I went in there one day and Mr. Norman tried to show me a mountain down towards Dewey Rose. I told him I saw it, but I didn't. There was never a mountain down there. I would think a man talking that way, his mind wasn't good. . . I thought he was queer. He knew me. Never failed to know who I was. He knew the people around, me and Miss Janie. Outside of him trying to show me the mountain I don't believe I recall any other statement or act that showed he didn't know what he was doing." The propounders thereafter introduced numerous witnesses who had talked with the testator during 1945, and who stated that his mind was perfectly normal.

Since the case comes to this court on the direction of a verdict,

we have carefully examined the evidence to see if any inference could be drawn from it that would authorize a jury to believe that the testator did not have sufficient mental capacity to execute a will. The evidence shows that the testator was a man of about eighty years of age when he executed his will, and that he was in feeble health. There is some indication from the evidence of the caveators that he occasionally made rather peculiar remarks, that he did not remember people as well as he once had, and that he no longer took an active interest in people or business affairs. There was nothing in the evidence of the caveators that showed more than "old age and weakness of intellect resulting therefrom," and this does not constitute mental incapacity to make a will, unless the weakness amounts to imbecility. Code, § 113-205. The evidence in this case totally fails to present an issue for a jury on the question of lack of mental capacity to make a will. Compare *Mason* v. *Taylor,* 162 *Ga.* 149 (132 S. E. 893); *Griffin* v. *Barrett,* 183 *Ga.* 153 (187 S. E. 828); *Hill* v. *Deal,* 185 *Ga.* 42 (193 S. E. 858).

Even if the evidence for the caveators had raised an inference that the testator did not at times have mental capacity to execute a will, none of the witnesses testifying for the caveators attempted to describe the condition of the testator's mind at the time the will was executed. One of the witnesses, whose testimony is emphasized in the brief of counsel for the caveators, Arthur Nelms, did not remember whether he saw the testator during the year that the will was executed. One witness had seen him at intervals extending over that period, but did not claim to have seen him on the day the will was executed. While evidence may be received as to the mental capacity of the testator at a prior or subsequent time to the execution of the will, as tending to illustrate the condition of his mind, if it be certain from all the testimony that at the time of the execution of the instrument there was no want of testamentary capacity, the instrument offered will not be refused probate on the ground of lack of testamentary capacity. *Hill* v. *Deal,* supra; *Peavey* v. *Crawford,* 192 *Ga.* 372 (15 S. E. 2d, 418); *Scott* v. *Gibson,* 194 *Ga.* 503 (22 S. E. 2d, 51); *Davis* v. *Aultman,* 199 *Ga.* 129, 142 (33 S. E. 2d, 317).

It was not erroneous to direct a verdict in favor of the propounders on the issue of the testamentary capacity of the testator.

■ The caveat alleged that for more than twelve months prior to the execution of his will, J. R. Norman was in an extremely impaired condition of mind and health, and was no more than a child in strength of mind, and that the propounders, Miss Fannie Carter and Mrs. Janie Hubbard, assumed absolute and arbitrary authority of his person and affairs, excluded the presence of everyone but themselves from the testator, and caused him to execute a will which was not his own.

It appears from the evidence that, in the early part of 1944, Mrs. Janie Hubbard moved into the home of J. R. Norman and his brother, John Norman. John Norman died on February 8, 1945. J. R. Norman was in very poor health and for some time before his death was unable to move about except in a wheel chair. There is much evidence in the record that Mrs. Janie Hubbard and Miss Fannie Carter nursed and waited on J. R. Norman during the period of his illness, from some time in 1944 until his death in June, 1946.

The principal witness for the caveators on the question of undue influence was O. C. Madden, who had worked for the Normans for a number of years, managed some of their properties, and was coadministrator with J. R. Norman of the estate of John Norman. His testimony is lengthy and most of it has no bearing on the issues of the case. Parts of his evidence relied on by the caveators to show undue influence (as set out in the brief of counsel) are as follows: On some occasions the propounders interfered with the witness's management of the Norman properties. They sometimes refused to let him see Mr. Norman, at times refusing to let him see Mr. Norman to have checks endorsed. The witness thought that it was in September, 1945, when they would not let anyone see Mr. Norman. Mrs. Hubbard at one time asked the witness about Mr. Norman's bank statement and when the witness took the statement to Mr. Norman, Mr. Norman turned to Mrs. Hubbard and said, "Here is the paper you wanted to see." The last time that Mr. Norman came to his store which was operated by the witness, on May 19 (apparently 1945), the witness drove him around, and Mr. Norman "made a statement about Mrs. Hubbard being after him to fix a paper. He made the remark about Col. Payne being

up there. Said he couldn't see any peace. Said Mrs. Hubbard wanted him to fix some papers. That was all he said. He didn't say what kind of papers, and I didn't ask him. It was the day Col. Payne was up there writing the will." On another occasion Mr. Norman and Mrs. Hubbard were at the store, "and she said to him, 'Let's go.' She told him he wasn't able to go on a trip. He got his stick and hobbled out to the car anyway. She said he wasn't able to go. He didn't pay any attention to her. After he got to the door she turned off and went to crying." (It should be noted that the witness Madden testified further with reference to the occasion of the ride of the testator with the witness as follows: "I have heard Mrs. Hubbard tell Mr. Norman he couldn't do anything. When he started out to ride with me, she didn't want him to go. She said, 'You are not able to go,' but he went anyway. He was a man of his own opinions. Anybody who knew J. R. Norman knew he had a head of his own.") The witness stated the following in regard to Mr. Norman's will: "I never did have any conversation with Mr. Jim Norman about his will. . . I did ask him if he authorized Mrs. Hubbard to call some one to write his will. He said, 'No.' That was in April before he made any will." In regard to a former will which the testator had made, which was drawn by a Mr. Adams, the witness stated: "Mrs. Hubbard had me call Mr. Adams, saying he, Mr. Jim, was ready to make a will. She asked if I saw anything of Mr. Adams."

There was evidence that on April 10, 1945, the testator made a deed to O. C. Madden to certain property, and that Mrs. Hubbard requested Mr. Norman's attorney to investigate the transaction to determine if Mr. Norman realized that it was a deed instead of a rental contract. The attorney arranged a conference between Mr. Norman and Mr. Madden, and Mr. Norman told him to let the deed stand, which concluded the matter.

The caveators insist that, under the evidence in this case, a jury might be authorized to believe that Mrs. Hubbard used her confidential relation as nurse to the testator to coerce him into making a will in behalf of the propounders, and that she accomplished her purpose by managing the testator's affairs and excluding all of his friends and business acquaintances from him.

The evidence of the exclusion of friends from the testator is entirely consistent with the evidence of the physician that he recommended that no visitors be allowed on account of the health of the testator. There is ample evidence that the propounders had an opportunity to influence the testator, but this without more is not sufficient to show undue influence. *Orr* v. *Blalock*, 195 *Ga.* 866 (25 S. E. 2d, 668). The inference might be drawn from the evidence that the propounders occupied a confidential relationship to the testator. "While undue influence may be proved by circumstances, merely to show an opportunity to exert it by one who occupies a confidential relation to the alleged testator, and who receives a substantial benefit under the instrument sought to be propounded, is not sufficient to prove it." *Brumbelow* v. *Hopkins*, 197 *Ga.* 247 (29 S. E. 2d, 42).

There is evidence that Mrs. Hubbard called the attorney who drew the will for Mr. Norman and asked him to come to see Mr. Norman. This is the only direct evidence that the propounders took any interest in having the will executed. It is insisted that the testimony of Madden that Mr. Norman had stated to him that Mrs. Hubbard was "after him to fix a paper," and "he couldn't see any peace," showed that Mrs. Hubbard was insisting on Mr. Norman making a will. Such evidence could do no more than raise a suspicion that Mrs. Hubbard had procured the execution of the will. "Undue influence, to invalidate a will, must amount to force or fear—must, in effect, make the will the mental offspring of some other person, and must be operative on the mind of the testator at the time the will is executed. It must destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse." *Galloway* v. *Hogg*, 167 *Ga.* 502, 524 (146 S. E. 156). Honest persuasion or intercession to procure a will to be made in favor of persons charged with exercising undue influence would not amount to undue influence. *Ward* v. *Morris*, 153 *Ga.* 421 (112 S. E. 719).

The disposition of property in this case was not an unreasonable one. The testator had no close relatives. The two main beneficiaries in the will were the two people who had cared for him in the last years of his life, while he was ill and almost

helpless. Even if the inference might be drawn that they cared for the testator for the sole purpose of obtaining his property after his death, there is nothing to show that the testator did not receive every care and attention in his time of need, or that he was dissatisfied with the arrangement. In *Gardner* v. *Lamback*, 47 *Ga.* 133, 192, it was said: "It is a wise provision of the law that whilst it takes great precaution to prevent fraud and imposition, it does not withdraw the testamentary privilege until the reason itself be gone. It is a precious right, and one that should be guarded with jealous care, that the aged and infirm, the weak-minded and eccentric shall have this security for care and attention on a sick bed. And it may be truly said, without any harsh criticism on human nature, that many a fired brain has been cooled by gentle hands, and many a death bed cheered and watched over with kind care, which, but for this tender care of the law for this testamentary right, would have been neglected and deserted."

On the question of undue influence in this case, there was insufficient evidence of such undue influence as would authorize a jury to return a verdict in favor of the caveators.

■ The caveators insist that the evidence "was abundant as to conflicts, circumstances, and incidents from which the jury could have drawn inferences, and was therefore a case which should have been submitted to the jury." While it is true that a wide range of testimony is permissible on the issue of undue influence, and undue influence may be shown by circumstantial evidence, this does not mean that testimony which might raise a mere suspicion in the mind of the jury that undue influence had been used to procure the will would require the court to submit the case to a jury. The positive testimony of the subscribing witnesses to the will showed that the testator heard the will read to him and stated that it was the disposition he desired of his property, that no one was in the room at the time the will was executed except the testator and the three witnesses, and that there was nothing wrong with the testator's mind. The attorney who prepared the will testified that he was alone with the testator when the testator gave him instructions on preparing the will. The testimony of these witnesses was sufficient to establish that

the testator had sufficient mental capacity at the time the will was executed, and that it was freely and voluntarily made. The evidence of the caveators was insufficient to controvert this testimony. Since there were no material conflicts in the evidence, and all the evidence introduced, with all reasonable deductions or inferences therefrom, demanded a verdict in favor of the propounders, it was not erroneous for the court to direct a verdict in favor of the probate of the will. Code, § 110-104; *Walters* v. *Walters*, 151 *Ga.* 527 (107 S. E. 492); *Colbert* v. *Pitner*, 157 *Ga.* 691 (9) (122 S. E. 315).

*Judgment affirmed. All the Justices concur.*