21249. GORNTO *et al.* v. GORNTO, Executor.

SUBMITTED JUNE 12, 1961—DECIDED JULY 6, 1961—
REHEARING DENIED JULY 24, 1961.

*Wm. T. Darby, Rountree & Rountree,* for plaintiffs in error.

*T. Ross Sharpe, T. Malone Sharpe,* contra.

HEAD, Presiding Justice. Willie D. Gornto sought to probate in solemn form the alleged will of George S. Gornto. The will bequeathed $5,000 and certain shares of stock to Willie D. Gornto, a nephew of the testator, who was named as executor, and his wife, Mildred Gornto. The residue of the testator's property was devised and bequeathed to Miss Clyde Johnson, who was not related to the testator. The caveators were the half-brothers and half-sisters of the testator, and the children of his two deceased brothers. The grounds of the caveat were that the testator did not have testamentary capacity at the time of the execution of the will because of his physical condition and the administration to him of stated amounts of drugs and narcotics, and undue influence exercised by the beneficiaries under the will. The issue was appealed to the superior court by consent, waiving judgment in the court of ordinary. At the conclusion of the trial, the judge directed a verdict for the propounder. The caveators in their motion for new trial as amended contend that the direction of the verdict was erroneous because the evidence made an issue of fact on both grounds of the caveat which should have been submitted to a jury. It is also asserted in a ground of the amended motion that it was error to refuse to admit certain evidence offered by the caveators.

The will was executed on December 5, 1959, while the testator was a patient in the Middle Georgia Hospital. He was suffering from cancer of the bone and lung, and his death occurred on December 28, 1959. He was 65 years of age at the time of his death. Durwood B. Mercer, the attorney who drew the will, was not acquainted with the testator, and went to the hospital to talk with the testator on the afternoon of December 4 at the request of Willie D. Gornto. The attorney was alone with the testator when the instructions were given him by the testator as to the disposition he wanted to make of his property. The attorney dictated the will to his secretary the next morning, and he and his secretary thereafter went to the hospital. The secre-

tary read the will to the testator, who suggested a correction in it (which he initialed), and executed the will in the presence of the attorney and the secretary as witnesses. The attorney testified that the testator was capable of expressing his desires, and was in his right mind. The secretary testified that the testator's mental condition was good, that he understood the provisions of the will, and that he stated that the will was in accordance with his wishes. During the time that the attorney and his secretary were in the testator's room, the testator was visited by a minister who had known him for thirty years, and this minister testified that the testator appeared to be normal that morning.

Dr. B. W. Forester, who had been the personal physician of the testator for five years, testified that Mr. Mercer had called him to ask him if the testator was able to make a will. The physician talked with the testator and the testator told him that he wanted to see an attorney. The physician wrote to the attorney and stated that the testator was very ill, but was able to think clearly and make his own decisions. The physician stated that, from his observation of his patient, seeing him one or more times a day, he was capable of making decisions as to his personal affairs on the dates of December 4 and 5.

The caveators introduced the hospital record of the drugs that were administered to the testator on December 4 and 5, and the testimony of three physicians (who had never seen the testator) that the drugs administered to the testator on the dates of December 4 and 5 would make a person unable to bring into mental review his property or family relationship, and that a person under the influence of the medication would be readily susceptible to suggestions. Three of the caveators, Rachel Gornto Branch, Connie Gornto Daniels, and Robert Gornto, testified that each visited the testator on December 6, and that he was not able to carry on an intelligent conversation.

Some of the circumstances on which the caveators relied to show undue influence were: The testator was in the Veterans' Administration Hospital at Dublin from August 30, 1959, until December 2, 1959. At the request of Willie D. Gornto, permission was given on December 2, 1959, by Dr. J. W. Stapleton, acting chief of the orthopedic service, for Willie D. Gornto

to take the testator from the hospital. Willie D. Gornto carried the testator in a station wagon to the home in Macon occupied by Miss Clyde Johnson and her parents. The Johnsons had formerly lived with the testator, and the home of the Johnsons had been purchased for them by him. Preparations had been made by the Johnsons for the visit of the testator by obtaining a hospital bed for his use. The testator remained in the Johnson home that night, and was admitted to the Middle Georgia Hospital at Macon in the afternoon of December 3. The other members of the testator's family were not notified of his removal to the Macon hospital until after the will had been executed. There was testimony by a number of witnesses as to amounts of money that the testator had loaned, or given, to Willie D. Gornto, and statements by the testator at different times that the testator had given Willie D. Gornto all the money that he intended to give him.

1. "Evidence is properly admitted which tends to establish mental incapacity of the testator prior or subsequently to the execution of a will, as illustrating the condition of the testator's mind. But where it is sought to establish testamentary incapacity by such evidence, it is not sufficient to controvert the positive testimony of the subscribing witnesses, unless it would be proof of testamentary incapacity at the time the will was executed." *Norman v. Hubbard,* 203 Ga. 530 (47 SE2d 574); *Hill v. Deal,* 185 Ga. 42, 46 (193 SE 858); *Peavey v. Crawford,* 192 Ga. 371, 372 (15 SE2d 418).

The testimony of the subscribing witnesses to the will made a strong case in favor of the testamentary capacity of the testator at the time the will was executed. This testimony was in harmony with the testimony of the minister, who had known the testator for thirty years, and who visited the testator at the very time the witnesses were present for the purpose of witnessing the will. The testimony of the caveators who saw the testator on the following day was insufficient to overcome the case made in favor of testamentary capacity.

The caveators urge that the testimony of three physicians testifying as expert witnesses was sufficient to make an issue as to the mental capacity of the testator to make a will. These

three physicians had never seen the testator, and based their opinions on his hospital chart which showed the narcotics which had been administered to him for the relief of pain.

Dr. Frank T. Robbins testified that the narcotics given the testator have a hypnotic effect and make the person using them more readily susceptible to suggestions, and that he would not consider a man suffering from the illness which the testator had and under the influence of narcotics to be mentally capable of understanding fully a will that he might be making. On cross-examination this witness testified in part: "I have never sworn that he was out of his mind on the day that he made that will, I swore he was under the influence of narcotics at the time he made that will, I will not swear he was out of his mind. . . . I did not say that it affected his mind except, because of the hypnotic effect, that he was readily more susceptible to suggestions. It would be easier for someone else's will to be substituted for his will. He would still appear to be normal except to the trained observer, except for the fact he was readily susceptible to suggestions made to him."

Dr. H. D. Youmans, after reciting the narcotics received by the testator on the dates of December 3, 4, and 5, stated: "In my opinion a patient in this condition would not be fully aware of what he was saying or doing during the days of December the fourth or December the fifth. It is very likely that he would not be able to concentrate and bring into mental review his property that he might have for disposition." On cross-examination this witness stated in part: "Some individuals can take more opiates than others. I would think the attending physician, looking right at him several times a day, had been his patient for ten years, that he would be in better position than we would here on just a supposition."

Dr. R. G. Brown testified that he was familiar with the narcotics administered to the testator, and that, "It is my opinion that he would not have been able to bring into mental review his property or his family relationship on either of these days." On cross-examination this witness testified in part: "Different patients have different degrees of tolerance for these drugs." After the admission of the testimony of Dr. B. W. Forester, who

had been the physician of the testator for five years, Dr. Brown testified on redirect examination as follows: "I have heard the testimony of the attending physician in this case where he has gone into further detail as to the condition of Mr. Gornto on the fourth and fifth of December, 1959. With this additional information as to the condition of this party at that time, my testimony would be the same as it was a few minutes ago. I would not think that this man would be capable at any time during the days of the fourth or fifth of December of comprehending the means of disposition of his property." The testimony of Dr. Forester, on which this opinion was purported to be based, was, in part, that the narcotics administered to the testator were under his orders, and that: "Based upon my treatment, my observation of this patient, seeing him one, two or three times a day, in my opinion this man was confined by cancer, he was in pain but was being relieved by drugs, he was capable of making a decision without a doubt as to what he wanted done with his own personal life."

In *Duncan v. Mayfield*, 209 Ga. 882 (76 SE2d 805), cited by the caveators, the hypothetical question propounded to the expert witness, a psychiatrist, was based on the evidence in the case as to the actions of the testator over a long period of years. The question was in regard to monomania, a partial insanity, which might affect a testator and induce the execution of a particular will, although the testator would appear perfectly rational to the subscribing witnesses to the will. In the present case the expert testimony of the physicians was not based on any evidence in the case as to the actions of the testator, but only on the medication given him, and it was admitted by two of these physicians that some patients have more tolerance for the narcotics than others. The other physician testified only in regard to the effect of the narcotics in making the patient more susceptible to the influence of others.

The evidence in the case did not make an issue as to the mental capacity of the testator to make a will, and it was not erroneous for the trial judge to direct the jury to find that the testator had testamentary capacity. *Spivey v. Spivey*, 202 Ga. 644 (44 SE2d 224); *Anderson v. Anderson*, 210 Ga. 464 (80 SE2d 807); *Nash v. Poss*, 212 Ga. 590 (94 SE2d 409).

2. "Undue influence, to invalidate a will, must amount to force or fear—must, in effect, make the will the mental offspring of some other person, and must be operative on the mind of the testator at the time the will is executed. It must destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse." *Galloway v. Hogg,* 167 Ga. 502, 524 (146 SE 156). "While undue influence may be proved by circumstances, merely to show an opportunity to exert it by one who occupies a confidential relation to the alleged testator, and who receives a substantial benefit under the instrument sought to be propounded, is not sufficient to prove it." *Brumbelow v. Hopkins,* 197 Ga. 247 (3) (29 SE2d 42); *Whitfield v. Pitts,* 205 Ga. 259, 273 (53 SE2d 549).

In *Bowman v. Bowman,* 205 Ga. 796 (55 SE2d 298), cited by the caveators, the testator's wife was altogether excluded by the terms of the will and the provisions of *Code* § 113-106 were applied, that in such a case, "upon the slightest evidence of aberration of intellect, or collusion or fraud, or any undue influence or unfair dealing, probate should be refused." In the present case the testator left no wife or child. His closest living relatives were half-brothers, half-sisters, nieces, and nephews. He stated to the attorney who prepared his will that he wanted to leave his property to the named beneficiaries, that, "They are the ones I want to give something to, they are the ones that have looked after me." In connection with Miss Johnson the testator stated to the attorney that he intended to get married just as soon as he got out of the hospital, that, "We have been putting it off a long time, but we just never have got around to it." There was testimony that, prior to his last illness, he had made substantial gifts to W. D. Gornto and to Miss Johnson, and the provisions in his will, therefore, were consistent with his past actions.

The beneficiaries of the will were not present when the testator gave the instructions as to the provisions of the will, nor at the time of its execution. The circumstances relied on by the caveators, which merely show an opportunity for the beneficiaries to exercise undue influence, which might continue to operate on the mind of the testator until the will was executed, were insufficient to make an issue as to undue influence. *Orr v. Blalock,* 195 Ga. 863 (25 SE2d 668).

Since the evidence for the caveators was insufficient to make an issue on lack of testamentary capacity or undue influence, it was not error for the trial judge to direct a verdict for the propounder.

3. In ground 7 of the motion for new trial as amended, it is contended that the court erred in refusing to allow Ralph Gornto, one of the caveators, to testify about a conversation that he had with the testator in 1952. This witness would have testified that the testator stated that W. D. Gornto had borrowed money from the testator in the past and had not paid it back, had tried to borrow additional money, which had been refused, and that W. D. Gornto had gotten all from the testator that the testator intended for him to have. The court ruled that the conversation with the testator in 1952 was too remote, and refused to allow the witness to testify about it. This ruling was not erroneous.

*Judgment affirmed. All the justices concur, except Duckworth, C. J., who dissents.*

Duckworth, Chief Justice, dissenting. I dissent upon the sole ground that the evidence made an issue of fact for a jury to decide on the question of whether or not the testator had the mental capacity to make the will.