## SMITH *vs.* SMITH.

[Jackson, C. J., not presiding in this case, on account of indisposition.]

1, 2, 3. The evidence was sufficient to warrant the verdict finding against the will propounded in this case.

4. There was sufficient evidence on which to base a charge in relation to the elements which go to make up undue influence, fraud, duress, etc.

5. It does not appear from the charge that the court required the mental capacity of the testatrix to be proved by such a degree of testimony as would authorize a conviction in a criminal case, – that being the exception made to it. The entire charge was full, fair and clear.

January 26, 1886.

Verdict. New trial. Charge of Court. Before Judge CARSWELL. Jefferson Superior Court. May Term, 1885.

Reported in the decision.

PHILLIPS & WYNNE, for plaintiff in error.

J. J. WHIGHAM; CAIN & POLHILL, for defendant.

HALL, Justice.

The executor of the last will and testament of Mary Ann Smith propounded it for probate in solemn form, when G. E. Smith, one of her heirs at law, appeared and caveated it, principally upon the ground that testatrix was not of sound and disposing mind and memory; that she was old and feeble in body,—was afflicted with paralysis, which affected her mind to such an extent that she was unable to resist importunity; that the paper propounded was not her free and voluntary act, and was, consequently, not her will, but the same was obtained by the undue influence of the executor, James R. Smith and his coadjutors, and that she was induced to make it by their fraudulent representations and practices in reference to the conduct of caveator toward her. The will was set up in the court of ordinary,

and from that judgment an appeal was taken to the supe-
rior court, and the trial on the appeal resulted in a verdict
finding that the instrument propounded was not the will
of Mary Ann Smith, deceased. The propounder thereupon
made a motion for a new trial, which was overruled, and
he took out a bill of exceptions and brought the judgment
refusing the new trial by writ of error to this court.

1, 2, 3. The three first grounds of the motion are, that
the verdict is contrary to law and evidence, decidedly and
strongly against the weight of evidence, against the prin-
ciples of justice, and is without evidence to support it.

An inspection of the record will show that the com-
plaint of its being against the weight of evidence and
without evidence to support it, is not well founded; there
is more evidence in favor of the verdict than against it,
both as to the capacity of the testatrix to make a will, and
as to the influence and practices to which resort was had
to induce her to execute this particular paper.  Three of
the four attesting witnesses to the will, one of whom was
the scrivener, swore that she was not of sound and dispos-
ing mind and memory, the other that she was.  These three
were supported in their opinion by other witnesses, who,
as well as themselves, state the grounds and reasons for
their opinion, while the other attesting witness was cor-
roborated in his opinion, for which he also gave the rea-
sons, by nearly an equal number of witnesses, who likewise
deposed to the facts on which they founded their opinion.
The testatrix was seventy years of age when stricken with
paralysis, which rendered her physically helpless, and
greatly impaired, though it did not destroy her mind.  The
will was made after the first stroke, and before others suc-
ceeded, from the effects of which she died in a few weeks.
The caveator, who had previously lived with her, was tem-
porarily absent at the inception of the disease; in his ab-
sence she was visited by Alexander, a son-in-law, and his
wife, who arranged with the propounder to remove her to
his house, where this will was made shortly after her arrival.

The propounder and his daughters, with Mrs. Alexander, were the sole legatees named in the will. No mention was made therein either of the caveator or of another absent son; the propounder applied to the scrivener to write the will, saying his mother requested him to do so, and named the persons whom she wished to attest it; he visited one of these persons, but found him from home; told Mr. Fleming, who was invited to draft the instrument, of the absence of this witness, and suggested the name of B. J. Brown in his stead. This arrangement was not agreeable. to Mr. Fleming, because, as he stated, he and Mr. Brown were not on good terms. Mr. Fleming was busy, and asked that the writing of the instrument might be deferred until the next day, but propounder was importunate and pressing, and he finally consented to write it that night. Upon reaching the house, accompanied by his father, one of the witnesses, he found Brown there, and asked him to remain; in a short time the other witness who was absent from home when waited on by propounder appeared. The testatrix was surrounded by the witnesses when instructions were taken for writing the will; during this time the propounder was present, and seems never to have been absent for a moment, and when testatrix was at a loss for an answer to enquiries about her will, especially in one instance, she was helped out by suggestions from the propounder, who said, "Mother, you know you told me so," or words to that effect. When the writing was completed and read to her, she made no response and gave no sign indicating that she understood its contents; she was held up in bed and her hand was guided by the scrivener when she signed the will by her mark; this was at midnight. The parties present, each of the attesting witnesses, were requested by propounder to say nothing about the will. Brown, the only attesting witness who swore to testatrix's competency, cautioned the scrivener to have the paper right, so that it could not be attacked and overthrown by the caveator, who he felt quite sure would object to its probate. The

testatrix remained at propounder's house only a short time after the execution of the will, and although there was no improvement in her condition, she was returned to her own home, accompanied by propounder's daughters, one of whom was a mere child, and the other only some fifteen or sixteen years of age. Caveator was in a neighboring county and was not informed of his mother's perilous condition until he reached the county of his residence, when it was communicated to him by strangers; he repaired at once to her residence and nursed her tenderly and devotedly until she died. Most of the time she lay in a stupor, and could not, if she had been diposed so to do, have given him information of what had occurred in his absence. He never knew that there was a will, until returning from the funeral, he stopped at propounder's house to get his dinner, and talking with him in reference to the estate, he was informed of it, and further taunted with being a houseless and homeless outcast; he was so rudely treated that he immediately left the house. It is true that the propounder attempts to account for and do away with the effect of these untoward circumstances by answering that his mother requested him to have the will written; named the person she desired to write it and the witnesses she would have to attest it; and that she desired the facts of its being executed to be kept secret; that she had been wronged by caveator, who got possession of her money to pay her bills and had misappropriated it, applying it to his own use and leaving her debts unpaid, which aroused her resentment against him. This latter allegation is positively denied on oath by the caveator, who testified that so far from misappropriating his mother's money, he used his own to relieve her of embarrassment. It is certain that he lived with her previous to her fatal illness, and we must infer, from the absence of proof to the contrary, that their relations were agreeable and harmonious; but even if this charge against the caveator were well founded, it does not supply a motive for disinheriting the absent

brother, who seems to have been entirely forgotten, without any assignable reason or excuse why he should not have been remembered. There is a strange absence of anything like evidence of a testamentary purpose on the part of the mother, prior to this attack; it does not appear that her purpose to make a will had been formed until she had been removed to propounder's house, nor is it shown how it then originated, or how it came to be made known. There is no detailed account of the events out of which it grew; the fact itself is all that is given. This outline of the prominent features of this case, give it, to say the least, a very suspicious appearance, and fully justifies, if it does not require, the conclusion reached by the jury.

4. The objection to the charge in relation to the elements that go to make up undue influence, fraud, duress, etc., viz., that there was no evidence on which to found it, is, as we think, wholly untenable. There is evidence, as we have shown, from which the jury was authorized to infer both undue influence and fraud in the procurement of this instrument.

5. Nor are we able to perceive that the court erred by requiring the mental capacity of the testatrix to be proved as alleged, by such a degree of testimony as would authorize a conviction in criminal cases. No such rule is laid down in express terms, nor can it be inferred from the instructions on that head. The full charge, which is sent up in the record, is a model of perspicuity, clearness and fairness upon these several issues, and is confined to the facts in evidence. It does not deal with issues other than those made by the pleadings and proof, and is not amenable to any of the objections made in the remaining grounds of the motion for a new trial. We agree with the presiding judge in the conclusion he has reached, that the verdict is proper and should not be disturbed.

Judgment affirmed.