1. While grounds of a motion for a new trial, complaining of the admission or rejection of evidence, the charge of the court, and other similar matters, must be complete and understandable within themselves, so as not to require this court to refer to other portions of the record in order to ascertain what evidence was rejected or admitted, the grounds of objection thereto, the charge complained of, and why and wherein such charge was erroneous — an assignment of error in a motion for a new trial, complaining of the direction of a verdict upon the ground that under the pleadings and the evidence there were issues of fact which should have been submitted to the jury, and that the evidence *Page 797 
adduced upon the trial would have authorized the jury to find a different verdict from that directed, is sufficiently definite and complete to require this court to examine the brief of evidence to determine the merits of such an assignment, and it is not incumbent on the complaining party to set out in such ground of the motion the evidence adduced upon the trial.
2. Where a will is attacked as having been obtained by undue influence, since such influence can seldom be shown except by circumstantial evidence, the attack may be supported by a wide range of evidence, such as a confidential relationship between the parties; the reasonableness or unreasonableness of the disposition of the testator's estate; diseases affecting the strength of mind of the testator; his dealings and associations with the beneficiary; his habits, motives, feelings; his strength or weakness of character; his family, social and business relations; his mental and physical condition at the time the will was made; his manner and conduct; or any other proved fact or circumstance going to show the exercise of undue influence on the mind and will of the testator. On such an issue there may be taken into account the peculiar facts and circumstances surrounding the issue, and acts, conduct, and circumstances may constitute undue influence when exercised on a person of failing mind, poor health, and other mental and bodily enfeeblements, which would not be such undue influence as to affect a will executed by a person of sound mind, good health, and intelligence.
3. Under the general rules of evidence, every presumption is in favor of the probate of a will after it is shown that the testator was of sound mind and disposing memory at the time the will was executed, but, where, as in this case, a testator has no child, and by his will excludes his wife and devises his entire estate to strangers, under the provisions of the Code, § 113-106, "the will should be closely scrutinized, and, upon the slightest evidence of aberration of intellect, or collusion or fraud, or any undue influence or unfair dealing, probate should be refused."
4. Either undue influence or monomania, or the two acting conjointly, or either one as ancillary or contributing to the active power of the other, may paralyze testamentary capacity, and the existence and operation of both are usually questions of fact for the solution of a jury. "Forces so subtle, so multiform, so variant in each case in which they may be disclosed, and in which the proof of their existence is so often dependent upon circumstances, present questions in which the court should properly leave any doubts which may arise from the evidence to the solution of `the doctors of doubt, the jury.'" Stephens v. Bonner, 174 Ga. 128 (2) (162 S.E. 383).
5. Partial insanity or monomania exists wherever a person conceives something to exist which has no existence whatever, and is incapable of being permanently reasoned out of that conception.
6. While the evidence in this case, taken as a whole, did not demand a verdict in favor of the caveatrix on the grounds of undue influence and monomania, it was sufficient to raise an issue which the jury should have been permitted to determine, and the court erred in directing a verdict for the propounder.
 No. 16731. SEPTEMBER 16, 1949. *Page 798 
On June 8, 1948, Fred E. Bowman filed in the Court of Ordinary, Fulton County, Georgia, an application to probate in solemn form the will of Frank K. Bowman, alleging that Frank K. Bowman died on May 28, 1948, leaving as his sole heir at law his wife, Joanne W. Bowman, who resided at a given address in Pensacola, Florida; and the usual citation for service on the heir at law was duly issued.
The will offered for probate was dated November 1, 1946, and devised to Fred E. Bowman, who was also named therein as executor, all of the property of Frank K. Bowman.
Item 3 of the will was as follows: "I have excluded my wife, Joanne W. Bowman, from participating in this will because of the fact that we are living in a state of separation, and I have pending in the Superior Court of Fulton County, Georgia, a suit for divorce directed against her. Furthermore, for the reason that while ill and incapable of caring for myself, she, the said Joanne W. Bowman, failed and refused to care for me."
Joanne W. Bowman filed a caveat to the will, which, as amended, was based upon three ground: (1) That the will was invalid because the testator did not have sufficient mental capacity at the time of its execution to make a valid will; (2) that the testator was at the time of the execution of the will incapable of exercising his free will and judgment, and that the will did not represent his own wishes, but those of his brother, Fred E. Bowman; and (3) that the testator, at the time of the execution of the will, was suffering from monomania or insane delusions toward the caveatrix, both the second and third grounds of the caveat alleging substantially the facts disclosed by the evidence adduced upon the trial, the material portions of which will be set out hereinafter.
The will was admitted to probate by the Court of Ordinary, and the caveatrix entered her appeal to the Superior Court of Fulton County, wherein she filed an amendment admitting a prima facie case in the propounder, and admitting the execution of the will and that the testator was at the time apparently of sound mind and testamentary capacity.
The case came on for trial on March 11, 1949, and a summary *Page 799 
of the material portions of the evidence is as follows: The caveatrix testified that her relations with the testator had been perfect until he suffered a stroke of apoplexy in February, 1946, of which she knew nothing until March 8, 1946. She testified that when she learned he was ill, she came immediately to Atlanta and went to his house, but was refused admission by Fred Bowman until after she had consulted an attorney, and that her husband at that time could not talk except for saying one word at a time, repeating the same. She testified that she looked after and waited upon him for about a week; that he was bodily removed from his own home to his brother Fred's home about a week after she got to Atlanta; and that she tried to see him there, and while the brother, Fred, admitted her, another brother tried to fight her, and she then left and returned to Pensacola, instructing them that when Frank was better, to send him to her or she would come and get him; that Frank returned to Pensacola alone, late at night, about a week after she returned, and was able to say only the one word, "empty, empty, empty"; and that he could not talk at all. She further testified that he was forced to be in bed when he first came, and that the doctor advised him to stay in bed, but his condition improved and he was later able to do small chores around the house; that, while she was away teaching school, she hired a woman to care for him; that he had medical care while he was in Pensacola, for which she paid; that his brother Fred worried him, wanting to bring him back to Atlanta; that after these visits by Fred, he would "slump" back; that when Frank left, he told her that he was coming to Atlanta for treatment, that he was only coming up to the doctors; that she later came for Frank at his request to take him back to Pensacola, but Fred refused to allow her to take him; that Frank accused her of poisoning him and that she never had tried to poison him; and that they had had no disagreements to amount to anything until his illness. She further testified that, when she asked Frank about the divorce, he repeated insistently, "Not me, not me, not me"; and that, when she asked him later why he had refused her letters, he repeated the same words.
Dr. Fenwick T. Nichols Jr. testified that he was a doctor at Grady Memorial Hospital in Atlanta, and that he had treated *Page 800 
Frank Bowman in May of 1948, which was the same month in which Bowman died. He testified: that at that time Frank was suffering from heart failure, and was not of sound mind; that he, Nichols, was unable to rely on the history of the patient because it was rambling and disjointed, and that, in his opinion, the patient at that time was demented; that Frank could not keep anyone with him to help him because he was paranoid and quarrelsome, that is, he had a false belief that someone did not like him or was trying to outsmart him; that he exhibited this paranoia in that he felt that people his brother had gotten to live with him were trying to poison him with the medicines they were giving him, and that he also manifested the same complaint about his wife; that his manner of talking at that time was quite disjointed and unintelligible; that he would start a sentence and end up talking about something else; that he could not say from his observation how long Frank had been mentally off; that he could have had it several years, and could have had the heart disability for a number of years and been in as bad a condition as he was when Dr. Nichols found him in May of 1948; that he had been in that condition for some time, but Dr. Nichols could not from observation say that Frank had or had not had it for two years; it could have been anywhere from two months to two years; but he could not give a definite statement; that he could not tell whether Frank's physical condition was such as would upset him mentally temporarily, or whether it would permanently upset his mental condition; that he knew nothing from experience about the mental condition of Frank Bowman in November of 1946; that insanity is manifested in many different ways; that, because a man walked up to him and told him that he knew what property he had and what he wanted to do with it, that would not make him sane; that a man could name every member in his family, that would not make him sane just because he knew certain things; that, in his examination of a patient, his diagnosis is partially based on the previous record of the hospital which is available to him, and in this case he scanned it very carefully; that he did not recall the period over which the report at Grady covered this patient, but felt possibly just before the time in question in 1946, and the condition which he found to exist at the time he *Page 801 
examined Bowman was in May of 1948, when he found the paranoid condition; that, from Frank's own statement, he could not tell whether this condition had been of a progressive nature or whether it had existed for some time, but he would have to depend on the records and Frank's brother's statement; that he could not depend on Frank's statements at all, he could not tell how long he had had this difficulty; that he had a heart condition; that his mental condition probably was not the result of that heart condition; that the heart condition was on the basis of arteriosclerosis, which was probably also the basis of his mental condition; you may get this coexisting; you may get a mental condition associated with heart disease, but particularly in the colored race, arteriosclerosis most frequently precedes heart conditions. Dr. Nichols further stated that he did not believe he would depend on any will Frank Bowman made; that in his opinion Frank did not have mental capacity to make a will or to dispose of his property; that it is possible for a man to have a perfectly insane delusion on one subject and be rational on others; that a man can be afraid that everybody will poison him and have an insane delusion with respect to that and yet be perfectly sane with respect to other things; that it is perfectly possible for a man to be afraid that his wife was going to poison him and yet be perfectly capable of disposing of his property by deed or will, if the two are not at all associated, but if the two come together in any manner, shape or form, then one would be biased and irrational.
Miss Lynette Graham testified on behalf of the caveatrix: that she was employed at Grady Memorial Hospital as a social worker and had been so employed since July, 1947; that her duties there were to help patients solve their social problems in connection with their medical problem; that she first saw Frank Bowman on July 23, 1947, when he was brought to her office by a doctor serving on the psychiatric service, and she talked with Frank in order to obtain a social history; that Frank was unable to talk in sentences, but could only say words; that he seemed to comprehend what was said to him, but could not reply except with words, and that he kept a small notebook in which addresses and statements were written and he would open the notebook and point to statements and names to assist *Page 802 
her in obtaining information; that Frank talked to her about his fears of being poisoned, and that he thought everyone was trying to poison him; that he said he was afraid that the people with whom he was living were trying to poison him; that he told her he was separated from his wife, Joanne, who was in Florida, and from whom he was attempting to obtain a divorce which she was contesting; he told her that he was trying to get rid of the couple in his house because he was afraid that the couple did not like him and were trying to poison him; that she would not express an opinion as to whether he had sufficient mental capacity to understand the nature of a will.
Alice Gaitor, a witness on behalf of the caveatrix, testified that she lived in Pensacola across the street from the home of the caveatrix and had known her and the decedent about sixteen years; that she knew Frank Bowman during 1946 when he was in Pensacola, and that during that time Frank was ill; that sometimes he was in bed and sometimes he wasn't, and sometimes he was able to work around the place; that she had heard arguments between Joanne and Fred, and she had heard Fred say that he was going to carry Frank back home; that she was familiar with Joanne and Frank's home, and it was kept clean and Frank was kept well fed; that Frank did not talk during this time, but gave signs and mumbled; that she could understand some things he was saying from the signs he would give, and he would point and she knew he didn't want to come back to Atlanta, he would make her understand him; that all the time he was down there in 1946 he could not talk; that he could give signs and mumble some things that you could understand. She also testified that Joanne and Frank were on friendly and affectionate terms during the period while Frank was in Pensacola, and she had seen them kiss and hug, go to church together, and the only times they had any arguments were when Fred was in town, and they would argue about him. She testified that Fred was always wanting Frank to leave and that she heard them arguing. She testified that Joanne told Fred that Frank was her husband and was married to her and Fred would say that he was going to carry Frank back home.
Mary Marchman, a witness on behalf of the caveatrix, testified: that she lived next door to Frank's home on Parsons *Page 803 
Place, in Atlanta, and recalled when Frank Bowman suffered a stroke; that she was living next door to him then, and Joanne came there during his illness; that Frank came to her after he had suffered a second stroke and asked her to send for Joanne, and that she called Joanne and was finally able to reach her. She testified that Frank asked her to call Joanne and ask her to come to Atlanta to see about him because he was sick, and that she gave Joanne this message. She testified that each day while she was trying to reach Joanne, Frank would ask her if she was able to get Joanne and when she was coming, and that he asked her this all through the day. She testified that Joanne did come, but she did not think that she saw Frank.
The caveatrix introduced in evidence a number of letters, among which was one dated October 26, 1946 (shortly after the trip to Pensacola to pick up the decedent's clothes), which letter was received by her from him, and in which he attempted to express to her his love for her, but was able to do so only in disconnected words as follows: "Atlanta, Ga., Oct. 26, 46, 1088 Fountain Dr., S.W. Dearest Frank: It was quite a pleasure to see you. our Love. this Love Memery Love Love Frank Love Aannat Joanne. Yours as ever, Frank K. Bowman."
The caveatrix also introduced in evidence (no question being raised by the record here as to whether they were properly admitted) certain records of Grady Memorial Hospital, a public hospital operated under and by virtue of the Fulton-DeKalb Hospital Authority, covering their history of the treatment of Frank Bowman from October 31, 1946, through May 28, 1948, the day of his death. The Emergency Case Report dated October 31, 1946, and introduced in evidence as plaintiff's exhibit 19, showed that Frank Bowman was then complaining of poisoning and was showing mild delusions on the day before the will was executed. The next report is an Outpatient History dated November 5, 1946, four days after the purported will was executed, and the doctor's report shows that the patient believed that he was being poisoned, but in the doctor's opinion this was only a delusion. The report of November 19, 1946, shows that the patient continued to believe that he was being poisoned. The report of December 16, 1946, showed that he was still having difficulty in formulating words, and the report of February 13, *Page 804 
1947, on the same sheet showed that he was still concerned with being poisoned and still talked with repetitions, pointing, stuttering, and anxiety. There were also other records introduced which dealt with the physical and mental condition of the testator up to the time of his death.
The caveatrix introduced in evidence the original pleadings in the divorce proceeding brought by the decedent against her, filed in Fulton Superior Court on September 7, 1946. Paragraph 5 of the petition alleges: that the petitioner became very ill with a cerebral hemorrhage the latter part of January, 1946; that the caveatrix came to Atlanta about February 23, 1946, for a visit of about two weeks; and that on or about March 28, 1946, the decedent went to Pensacola and stayed with the caveatrix until about August 26, 1946, although on account of his physical and mental condition he was incapacitated and, therefore, did not comprehend the full meaning of his going to visit his wife and remaining with her. In an amendment to the petition filed May 14, 1947, the decedent alleged that the caveatrix threatened to poison and kill him while he was in Florida, and that she never did stay home with him to wait on him while ill or prepare his meals or furnish any groceries.
A. E. Wilson, the attorney who drew the will, testified on behalf of the propounder that the decedent came to his office alone and told him what to put in the will, and that in his opinion the decedent had capacity to make the will. He also testified that the decedent told him that he had been ill and that his wife had not taken care of him, and his brother had, and for that reason he wanted to leave his property to his twin brother.
Dr. W. H. Holbrook testified on behalf of the propounder that he had attended the decedent from February 21, 1946, and that the decedent had suffered a stroke of apoplexy from which he was rather stupid at first. He further testified that this condition cleared up, and there was thereafter nothing wrong with his mind. He testified that the decedent came by his office several times during the summer of 1946 and was able to walk.
In addition to this testimony with reference to the physical and mental condition of the testator, the caveatrix further testified that, from the time of her marriage to Frank in 1931 until he came to Atlanta to work, they had lived in Pensacola with *Page 805 
Fred and his wife, Dora; and that Joanne's relationship with Fred was not good because he was constantly trying to influence Frank against her. She testified that she was a school teacher in Pensacola and did not come to Atlanta with Frank when he came, which was about ten years after their marriage, because of financial conditions and because he was subject to be called into the army. She testified that he had a permanent job promised him in Atlanta, but did not actually have it, and he told her to stay in Pensacola until he got the job and became situated. She testified that, after Frank came to Atlanta, she spent all of her holidays with him, and he came to Pensacola on every leave he had. She testified that Frank bought a home in Atlanta in 1944, in which she stayed when she came on visits. She testified that there was not rift in their happiness until Frank suffered a stroke in February, 1946, of which she did not learn until March 8, 1946, and that when she learned of his illness, through an anonymous letter, she came immediately to Atlanta and went to the house at 87 Parsons Place. She testified that Fred, Frank's twin brother, who had never liked her, refused to allow her to enter the house, that she was forced to consult a lawyer about her rights, and that thereafter she returned and entered the house. She found Frank ill and tried to talk with him, but he could not talk except for repeating one word at a time. She found Fred's sister, and her sister-in-law, and Fred in the house with Frank at the time. Frank's brother told her not to come in the room because she disturbed Frank, and that he didn't want any women around him, but she stayed there and cared for Frank until Fred moved Frank out of the house to his own home about a week after she got there. She tried to see Frank at Fred's house, but another brother tried to fight her, and since she was alone in Atlanta, she left and returned to Pensacola. Before leaving, she got a bankbook that Frank had sent her and gave it to Fred, telling him that, if he needed it, she would leave it and that she was going to Pensacola. She requested that, when Frank was better, Fred send him to her or let her know and she would come and get him. She told Frank the same thing and then returned to Pensacola. About a week later, Frank returned to Pensacola at midnight. She found him knocking on her door at midnight, and before *Page 806 
opening the door, she asked who was there and Frank was able to say only, "Empty, empty, empty." She took Frank in and cared for him, furnished him with medical care, food and clothing, and hired a woman to care for him while she was at school. She testified that he was at first kept in bed, but after his condition improved, he did small chores around the house. She testified that Fred made several trips to Pensacola to see Frank and Fred's visits worried Frank. Fred wanted to bring Frank back to Atlanta, telling him the doctors in Pensacola were no good, that the doctors at Grady knew his case, and there were no psychiatrists in Pensacola and the doctors there didn't know what they were doing. Fred told Frank to come back to Atlanta and he would pay his bill or a friend of theirs would do so. She testified that after Fred left, after each of these visits, Frank "would just go back, slump back." Fred made at least four visits to Frank during the time he was in Pensacola from the end of March to August 26. She testified that Frank finally succumbed to Fred's entreaties and returned to Atlanta from Pensacola on August 26, 1946. Frank told her when he left that he was coming to a doctor for treatment and would return to Pensacola. She carried him to the train, sat with him while they were waiting for the train to leave, talked with him, and kissed him good-bye. He promised her that he would be back and that he was only coming to the doctors. She testified that the next she heard from him was a copy of a divorce petition. She testified that Frank did return to Pensacola, but came with Fred a day or two after she received the petition, for the purpose of getting Frank's belongings, and that she had a conversation with Frank about the divorce while he was there. She showed him the papers and asked him what they meant, and his only response was, "Not me, not me, not me." Fred and Frank stayed in the house packing Frank's belongings about four hours, during which time she was with them, and when Frank left, she went to the dentist with him and left him there. She testified that she made further efforts to see Frank, and that Frank sent for her to come and get him, and when she came, Fred refused to let him go. She testified that Frank called her by long-distance to come and get him, and when she came to get him, Fred stood between the door and *Page 807 
her. When she came to get Frank and Fred refused to allow her to enter, she asked Frank why he had refused her letters, and he said, "Not me, not me, not me." She told him that she had come for him and was ready to go, and Fred spoke and would not let her have him. She testified that Frank was never, during the period of his illness, which commenced early in February, 1946, able to express himself clearly. She testified that Frank accused her of poisoning him. She testified that he made this accusation when she came after him after the divorce was filed, when Fred refused to let her have him and that he had accused others of trying to poison him. She testified that she had never tried to poison him. She identified a number of letters from Frank to her, which were later introduced in evidence, and which revealed the affectionate feeling Frank had for her for several years before the stroke in question, and continuing through January 26, 1946, immediately before the stroke. She testified on cross-examination that she and Frank had never had any discussion about a divorce, and that she knew nothing about a divorce until she received a copy of the divorce petition. She testified: that Frank had been sick off and on, but that she knew nothing about the stroke until she got a letter, and that she had never written to him about the stroke; that Fred had continually throughout their married life tried to influence Frank; that she tried to see Frank in 1948 before he died, but was unable to do so; and that she was not notified of Frank's death, but found out from a sister-in-law of Fred's wife.
After the introduction of evidence by both parties, the trial court directed a verdict against the caveatrix and in favor of the propounder. The caveatrix filed her motion for a new trial on the general grounds, which she later amended by adding thereto grounds 4 and 5, as follows: "4. That the trial court, as movant contends, erred in directing a verdict against your caveatrix because there were issues of fact which should have been submitted to a jury. 5. That the trial court, as movant contends, erred in directing a verdict against your caveatrix because there were issues of fact adduced upon the trial which should have been submitted to a jury and the evidence would have authorized a jury to find a different verdict from that directed." *Page 808 
To the judgment overruling the motion for a new trial as amended, the caveatrix excepted.
1. It is insisted by counsel for the defendant in error that the 4th and 5th grounds of the amended motion for a new trial, assigning error upon the direction of a verdict, are not in such form as to be considered by the court, for the reason that they are not complete within themselves in that they do not contain "the evidence pertinent to the points sought to be raised in these grounds;" that such evidence should have been isolated from the mass of evidence contained in the brief and put in these grounds, and that the court should not be required to read more than one hundred pages of testimony to determine whether they are good. It is contended that the plaintiff in error is relegated to such assignments as relate to the general grounds, and that the only question presented is whether the verdict was contrary to the evidence, decidedly and strongly against the weight of the evidence, without evidence to support it, and contrary to the principles of justice and equity. Counsel for the defendant in error cite in support of this contention the following cases:Mobley v. Russell, 174 Ga. 843, 847 (164 S.E. 190),Owens v. Nichols, 139 Ga. 475 (5) (77 S.E. 635), andBowen v. SmithHall Grocery Co., 146 Ga. 157 (4) (91 S.E. 32).
In the Mobley case, supra, the assignment of error dealt with was one complaining that the court erred in allowing portions of the pleadings and evidence to be read to the jury; and it was there held that, since the portions of neither the pleadings nor the evidence, which were alleged to have been read to the jury, were set out in substance or attached as an exhibit, the ground was incomplete and would not be considered. In theOwens case, supra, it was held: "Where complaint is made of refusal of the judge to admit in evidence the opinion of a non-expert witness, the facts upon which the opinion is based should be set out in the ground of the motion." In the Bowen
case, supra, this court was dealing with assignments of error, complaining of certain excerpts from the charge of the court, which merely alleged *Page 809 
that "this charge was error for reasons stated in" other numbered grounds, and this court held that grounds of the motion for a new trial should be complete within themselves, and that, when a particular ground is under consideration, reference to other grounds should not be required in order to understand the assignment of error. Many other cases might be cited wherein in it has been held that grounds of a motion for a new trial, complaining of the admission or rejection of evidence, charges of the court, and other similar matters, should be complete within themselves and should not require reference to other parts of the record in order to ascertain what the evidence admitted or rejected was, or its materiality, or the grounds of objection thereto, or to the charge of the court. But such rulings have no application to the assignments of error in the 4th and 5th grounds of the motion for a new trial in the present case. The question presented by these grounds is whether there was any evidence adduced upon the trial raising issues of fact which should have been submitted to the jury, or whether the evidence introduced would authorize the jury to return a verdict different from that directed; for, unless all the evidence together with all reasonable inferences or deductions that might have been drawn therefrom demanded the particular verdict directed, the trial court erred in directing it. The 4th and 5th grounds of the amended motion specifically allege that the court erred in directing the verdict because there were issues of fact which should have been submitted to the jury, and evidence introduced which would have authorized the jury to find a different verdict from that directed by the court. To the overruling of the motion contained in these grounds exception is taken in the bill of exceptions, and this court has held that this is a sufficient assignment of error. Bosworth v. Nelson, 172 Ga. 612
(158 S.E. 306); Mullis v. McCook, 185 Ga. 171 (194 S.E. 171);Ford v. Ford, 203 Ga. 681 (47 S.E.2d 865).
Since an examination of all the evidence is required in order to pass upon these assignments of error, the brief of evidence must be looked to by this court, for it would unnecessarily encumber and enlarge the record to require that the entire evidence be set out in these grounds of the amended motion.
2-6. Counsel for the plaintiff in error state in their brief that *Page 810 
"the only question here involved is whether or not sufficient evidence of undue influence and/or monomania was adduced upon the trial to make an issue of fact for decision by the jury."
In approaching this question we are not unmindful of the rulings by this court to the effect that, while undue influence may be proved by circumstantial evidence, it is not sufficient to establish undue influence to show merely that the persons receiving substantial benefits under the instrument sought to be propounded occupied a confidential relationship to the testator and had an opportunity to exert undue influence. Norman v.Hubbard, 203 Ga. 530 (47 S.E.2d 574), and cases cited.
The Code, § 113-208, provides: "The very nature of a will requires that it should be freely and voluntarily executed; hence, anything which destroys this freedom of volition invalidates a will; such as fraudulent practices upon testator's fears, affections, or sympathies, duress or any undue influence, whereby the will of another is substituted for the wishes of the testator."
In Redfearn on Wills and Administration of Estates (Rev. Ed.), § 52, it is said: "A very wide range of testimony is permissible on the issue of undue influence. This is due to the fact that undue influence seldom can be shown except by circumstantial evidence. It results from the circumstances and surroundings of the testator and his associations with the person or persons exercising the undue influence. For this reason it is proper, on this issue, to consider the testator's dealings and associations with the beneficiaries; his habits, motives, feelings; his strength or weakness of character; his confidential family, social, and business relations; the reasonableness or unreasonableness of the will; his mental and physical condition at the time the will was made; his manner and conduct; and generally every fact which will throw any light on the issue raised by the charge of undue influence."
On the issue of undue influence, the rules of evidence take into account the peculiar circumstances surrounding the issue; and acts, conduct, and circumstances may constitute undue influence when exercised on a person of failing mind, poor health, and other mental and bodily enfeeblements which would not be such undue influence as to void a will executed by a person of sound mind, good health and intelligence. Pennington v.Kerrigan, *Page 811 159 Ga. 345 (125 S.E. 795); Boland v. Aycock, 191 Ga. 327
(12 S.E.2d 319).
In Fowler v. Fowler, 197 Ga. 53 (2) (28 S.E.2d 458), it was held: "An attack on a will as having been obtained by undue influence may be supported by a wide range of testimony, since such influence can seldom be shown except by circumstantial evidence. Thus, a confidential relation between the parties, the reasonableness or unreasonableness of the disposition of the testator's estate, old age, or disease affecting the strength of the mind, tending to support any other direct testimony or any other proved fact or circumstance going to show the exercise of undue influence on the mind and will of the testator, are relevant. While the quantity of influence varies with the circumstances of each case, according to the relations existing between the parties and the strength or weakness of mind of the testator, the amount of influence necessary to dominate a mind impaired by age or disease may be decidedly less than that required to control a strong mind. Dean v. Littleton, 651 (4), 654 (131 S.E. 507); Stephens v. Bonner, 174 Ga. 128
(162 S.E. 383); Evans v. Arnold, 52 Ga. 169 (4), 182;Walker v. Roberts, 20 Ga. 15, 25; Smith v. Smith,75 Ga. 477 (4); Davis v. Frederick, 155 Ga. 809 (5-7) (118 S.E. 206); Peretzman v. Simon, 185 Ga. 681
(196 S.E. 471); Griffin v. Barrett, 185 Ga. 443 (195 S.E. 746);Gaither v. Gaither, 20 Ga. 709, 721; Code, § 37-706;Trustees of Jesse Parker Williams Hospital v. Nisbet,191 Ga. 821 (14 S.E.2d 64)."
It must also be borne in mind that this case, in which the testator's wife was altogether excluded by the terms of the will, and the testator's property was devised to a stranger (Deans v.Deans, 166 Ga. 555, 144 S.E. 116), comes within the terms of Code § 113-106, which provides: "A testator, by his will, may make any disposition of his property not inconsistent with the laws or contrary to the policy of the State; he may bequeath his entire estate to strangers, to the exclusion of his wife and children, but in such case the will should be closely scrutinized, and, upon the slightest evidence of aberration of intellect, or collusion or fraud, or any undue influence or unfair dealing, probate should be refused."
In Deans v. Deans, 171 Ga. 664, 681 (156 S.E. 691, 74 *Page 812 
812 A.L.R. 222), it is pointed out that, under the general rules of evidence, every presumption is in favor of the probate of a will after it is shown that the testator was of sound mind and disposing memory at the time the will was executed; but that, under the provisions of Code § 113-106, if it appears that the testator has excluded his wife, and that he has no child, "there is but little, if any, presumption in favor of the propounder; for the will is to be closely scrutinized, and upon theslightest evidence of aberration of intellect, or collusion,or fraud, or any undue influence or unfair dealing, probate should be refused. Rules as to the nature of proof and the quantum of evidence necessary for a caveator to produce and present to the court and jury, in ordinary cases of probate of wills, can have no application in the face of the declaration that probate of a will of the class referred to in section 3832 [Code, § 113-106] should be refused upon the slightest evidence of any of the ingredients or operative causes set forth in the Code section. The law does not define the term `slightest evidence,' but it is the superlative degree of the adjective slight, and therefore must mean very slight. In other words, to use the language of Chief Justice Bleckley, if we are to `let the General Assembly charge the jury in its own words,' the legislature tells the jury `that very slight evidence (in a case coming within the terms of section 3832, and to which that Code section is applicable) of aberration of intellect, or collusion, or fraud, or any undue influence or unfair dealing, if you believe it is true, will make it your duty to refuse probate of the will.'" See also Smith v. Davis, 203 Ga. 175 (2), (45 S.E.2d 609).
It is true that there is no direct evidence in the record in this case that the propounder and devisee under the will ever mentioned the question of a will or the disposition of his property to the testator; but — considering the testimony as to the testator's physical and mental condition, and the apparent control exercised over him by his brother in connection with the fact that the decedent's letters to his wife indicated that the relationship existing between them was friendly and affectionate up until the time he suffered the cerebral hemorrhage, the filing of the divorce petition only nine days after he returned to Atlanta from Pensacola at the insistence of his brother, the fact that he *Page 813 
repeatedly denied to the caveatrix any responsibility for the divorce petition, or for the refusal of her letters addressed to him, and the letter which he wrote the caveatrix about two weeks after his final visit to Pensacola, expressing his love to her — it cannot be said that there was not the slightest evidence from which a jury might have found that the decedent was so completely under the domination and influence of his twin brother that he was unable to assert his own wishes and desires, and unable to make a will which would reflect his own thought.
It is clearly apparent from the allegations of the divorce suit filed by the testator against the caveatrix that he was laboring under the belief that his wife was having improper relations with other men and another woman, and was trying to poison him, and from the third item of the will, that his wife had failed and refused to care for him while he was ill and incapable of caring for himself, when the caveatrix testified that she had throughout her married life been devoted to the decedent and had at all times sought to make him a loving, virtuous, and devoted wife, and that she had cared for him for a period of more than six months during his illness and would have continued to do so, but for the acts of the testator's twin brother which prevented it. It is also true that there is no direct evidence to support the allegations of the 3rd ground of the caveat, that these beliefs on the part of the testator were induced by representations on the part of his brother Fred, and members of Fred's family, but such proof is not necessary in order to show that the deceased was suffering from monomania. That such belief did exist is clearly apparent from the statements contained in the divorce petition and the will. Whether they were or were not well founded, or whether they were insane delusions, and if such, whether the will excluding the wife was the result of such delusions, are questions which it would seem to us must be determined by the jury, and not by the court. Bohler v. Hicks, 120 Ga. 800 (48 S.E. 306);Dibble v. Currier, 142 Ga. 855 (83 S.E. 949); Yarbrough
v. Yarbrough, 202 Ga. 391 (43 S.E.2d 329).
While the admissions by the caveatrix on the trial of a prima facie case in favor of the propounder, or the evidence, introduced by the propounder, if standing alone, would have required the verdict directed by the court, the evidence, taken as a whole, *Page 814 
was sufficient to raise an issue on the grounds of undue influence and monomania, which the jury should have been permitted to determine, and the trial court erred in directing a verdict for the propounder.
Judgment reversed. All the Justices concur.