S10A1497, S10X1498. McDANIEL v. McDANIEL; and vice versa.
(707 SE2d 60)

NAHMIAS, Justice.

In this probate case, the propounder filed a petition for probate in solemn form to have a 2007 will declared the testator's last will and testament. The caveator challenged the will on the grounds of lack of testamentary capacity, undue influence, and fraud. A jury found that the 2007 will was the product of undue influence and fraud, and the probate court entered judgment on the verdict. In Case No. S10A1497, the propounder appeals, contending that the probate court erred in denying his motion for directed verdict on undue influence and fraud and, in the alternative, that a new trial is required due to erroneous evidentiary rulings. In Case No. S10X1498, the caveator files a defensive cross-appeal, asserting error in the exclusion of testimony by a doctor who treated the decedent and two instances of alleged instructional error. For the reasons that follow, we affirm the probate court's judgment denying admission of the 2007 will to probate; the cross-appeal is therefore moot.

1. Viewed in the light most favorable to the verdict, the facts are as follows. See *Lillard v. Owens*, 281 Ga. 619, 620 (641 SE2d 511) (2007). Mary Agnes Royster McDaniel (Ms. McDaniel) was married to Luther Lee "Mutt" McDaniel (the testator) for over 60 years, until her death at age 87 on December 10, 2006. The testator died two-and-a-half years later on June 24, 2009, at the age of 92. The McDaniels had two sons, Charles Lee McDaniel (the caveator) and Jerry Clyde McDaniel, Sr. (the propounder), both of whom are married. Prior to the events that gave rise to this litigation, the family apparently got along well.

In 2002, the testator and his wife, who were then in their 80's, executed wills prepared by their attorney, James Clyde Morris, Jr., leaving everything to the surviving spouse, and if there was no surviving spouse, to their two sons equally. Ms. McDaniel suffered from Alzheimer's-related dementia and other ailments, and by 2006, the testator could no longer care for her on his own. The caveator moved in with his parents in January 2006, and for the first part of that year, the propounder and his wife stayed with the elder McDaniels some weekends to alleviate the burden on the caveator. They continued to visit regularly after that time. Over the course of 2006, the elder McDaniels added the caveator's name to all their bank accounts so that he could manage their financial affairs for them.

Ms. McDaniel exhibited some common signs of dementia. For example, she was often confused, occasionally paranoid, and had trouble remembering where she put things. She would ask the caveator to take her silver and jewelry and put them someplace safe. The caveator would store them in his safe-deposit box at the bank, and when his mother asked for them a month or so later, he would bring them back until his mother asked him to take them away again. The caveator also held the receipt for a mink stole that his mother had stored at a facility in Athens. When she could still ride in a car, the caveator would drive his mother to Athens to retrieve the stole whenever she wanted it. However, when she could no longer ride in a car, she asked him to take the mink stole to the storage facility, which he did, and he held onto the receipt, which was in his name.

Toward the end of 2006, the testator also exhibited signs of confusion and declining mental status. Shortly before his wife of 60 years died, the testator got into his truck and turned on the windshield wipers but could not recall how to turn them off. The testator also had difficulty sleeping and trouble differentiating between night and day and remembering what day of the week it was. After his wife died, the testator's confusion worsened.

When the testator's wife died on December 10, 2006, the propounder and his wife strongly encouraged the caveator and his wife to take a much-needed vacation to Florida. The caveator was concerned about leaving his father alone, but the propounder and his wife assured him that they would stay with the testator to keep him company. The plan was that the caveator and his wife would leave for Florida on December 29 and stay there for a week or so before returning. Before leaving, the caveator drove his father to several banks to remove Ms. McDaniel's name from joint accounts worth several hundred thousand dollars, and on Tuesday, December 26, 2006, the caveator drove the testator to attorney Morris's office to inquire about the process for probating Ms. McDaniel's will. They scheduled a meeting for that Friday, December 29, 2006, with Morris, the testator, the propounder, the caveator, and their wives.

On Thursday, December 28, 2006, the caveator went to Regions Bank and closed an account worth approximately $32,000 that had been held jointly in his and his mother's names, transferring the funds into a new account in his name only. It was important to Ms. McDaniel to provide for her funeral and that of her husband before she died. To that end, she had told the caveator to use the $32,000 account to pay for the two funerals and to keep whatever was left.

At the meeting on December 29, Morris informed the testator and the caveator that they should not have removed Ms. McDaniel's name from the joint bank accounts. The propounder asked why the

accounts were all in the testator and the caveator's names and suggested that the testator's name be removed from them and that his name be added along with the caveator's. The caveator took that to mean that the propounder did not think their father should have any further say-so in his financial affairs, and the caveator said that things should be left the way they were. The issue was not resolved at that meeting, which appeared to end amicably. The caveator and his wife dropped the testator off at his home on the way out of town for their Florida vacation, and the propounder and his wife came over later that evening to stay with the testator.

Unbeknownst to the caveator, the propounder and his wife now believed that the caveator had stolen from the testator the roughly $600,000 they estimated was held in the joint bank accounts by having his name added to the accounts. They went through the testator's drawers, found his bank statements, and convinced the testator that the caveator had stolen all his money, that he was now "broke," and that the caveator and his wife had moved to Florida and were not coming back. The testator was confused and distraught, and he repeated these claims to other relatives, as did the propounder.

The propounder also told his father that he would help fix everything, and when the banks opened on January 2, 2007, the propounder and his wife drove the testator to the banks, where the testator removed the caveator's name from all the joint accounts. The propounder called attorney Morris's office and set a meeting to change the testator's will for January 4, and he also changed the locks on the testator's house. The caveator and his wife remained in Florida.

At the January 4 meeting, the propounder asked Morris to draft a new will for his father that left the propounder everything and disinherited his older brother completely. Morris refused to take instructions from the propounder because the propounder was not his client. The propounder got mad, argued with Morris, and threatened to take the testator to another attorney to make the changes. The dispute subsided, and Morris took the testator into another room, where the testator told him to draw up a new will leaving everything to the propounder. The testator told Morris that the caveator "has gotten all the money from me he's going to get." Morris asked the testator if he wanted to leave anything to his grandchildren through the caveator, and the testator said to draft the will to leave his granddaughter 10% of his estate and his grandson 1%, with the rest to the propounder and nothing to the caveator.

The next day, the propounder and his wife brought the testator back to Morris's office, where the testator executed the new will. He also executed a durable power of attorney authorizing the pro-

pounder to take full control of his financial affairs. The propounder's wife told Morris that Ms. McDaniel's jewelry and other items were missing, and the testator instructed Morris to get a restraining order to keep the caveator from coming back to his father's house.

When the caveator got back from Florida a few days later, he called the propounder to ask what was going on, but the propounder refused to speak with him and told him that he needed to call Morris. The caveator called Morris and arranged a meeting for January 9, 2007. At the meeting, Morris handed the caveator a letter saying that the testator did not want the caveator to come on his property again until after the probate of his mother's estate was completed due to "some questionable actions and/or statements which have been made by yourself over the last several months prior to and immediately after your mother's death." The letter threatened the caveator with "judicial restraint" if he failed to respect his father's wishes. Morris again told the caveator that he had no right to close out the $32,000 account and put it in his name and asked him to return his mother's jewelry and the mink stole.

After the meeting, the caveator's wife called Morris's office and left a message saying that she and her husband never meant to take any money or cause any problems, that they were just trying to do what they thought Ms. McDaniel wanted them to do with the $32,000 account, and that they would return everything that was being requested. Two days later, the caveator took a check to Morris's office for all the money taken from the joint account he had with his mother and returned his mother's jewelry and the claim ticket for the mink stole.

The caveator did not see his father for the next six months while the probate of his mother's estate was pending. When he was allowed to visit his father again, he did so. His father did not recognize him at first, but when the caveator told him who he was, his father was glad to see him. The caveator never discussed with his father the changes to the will, but at one point, the testator made reference to it, saying that "it was just a bad situation." Around this time, the propounder began using the testator's power of attorney to convert the testator's property into the names of the propounder and the testator jointly, giving himself survivorship rights on real estate, bank accounts, certificates of deposit, and mutual funds.

The propounder and his wife moved the testator into the basement of their new home in December 2007, where he lived until his death on June 24, 2009. The caveator was not allowed to visit his father without first making an appointment with the propounder, and the propounder told the caveator that he was recording the visits. The propounder also attempted to make the caveator "sign in" on a register whenever he visited.

After the testator's death, the propounder filed a petition to probate the 2007 will in solemn form, and the caveator filed a caveat. The parties presented their case to a jury, and the probate court denied the propounder's motion for a directed verdict sustaining the 2007 will. The jury found that the 2007 will was not valid and should be denied probate on the grounds of undue influence and fraud, and the probate court entered judgment on the verdict. The propounder appealed, and the caveator filed a defensive cross-appeal.

2. The sole question in a proceeding to probate a will in solemn form is " 'whether the paper propounded is, or is not, the last will and testament of the deceased.' " *In re Estate of Corbitt*, 265 Ga. 110, 110 (454 SE2d 129) (1995) (citation omitted). The result turns on three issues: (1) whether the document was properly executed; (2) whether the testator had the mental capacity to execute a will; and (3) whether the document was the result of undue influence, fraud, duress, or mistake. See id. The caveator conceded due execution of the will, and the jury found in favor of the propounder on the issue of testamentary capacity. The propounder contends that the probate court erred in denying his motion for directed verdict on undue influence and fraud.

(a) *Undue Influence*: The standards we apply in reviewing a jury's finding of undue influence in the execution of a will are well established.

> "Undue influence 'may take many forms and may operate through diverse channels.' " There is no requirement that the undue influence be directly attributable to the propounder or to a single beneficiary. Although evidence which merely shows an opportunity to influence is not itself sufficient, a "caveat based upon the ground of undue influence may be supported by a wide range of evidence, as such influence can seldom be shown except by circumstantial evidence."

*Bailey v. Edmundson*, 280 Ga. 528, 530 (630 SE2d 396) (2006) (citations omitted). Absent legal error on the part of the probate court, a jury's finding of undue influence will be affirmed "if there is any evidence to support the trier of fact's determination." *Trotman v. Forrester*, 279 Ga. 844, 845 (621 SE2d 724) (2005).

As shown by the detailed recitation in Division 1 of the evidence presented at trial, the jury in this case was clearly authorized to find that the 2007 will was the result of undue influence. When the testator could no longer care for his sick wife of over 60 years, the caveator moved in with them and provided the care his mother and father needed with little help from the propounder. See *Bowman v.*

*Bowman*, 205 Ga. 796, 797 (55 SE2d 298) (1949) (noting relevance to undue influence of testator's "dealings and associations with the beneficiary"). After Ms. McDaniel died, the propounder and his wife encouraged the caveator and his wife to leave the state for a vacation and in their absence poisoned the testator's mind against the caveator, telling him falsely that the caveator had stolen all his money, that he was now broke, and that the caveator had abandoned him and would not return. See *Lillard*, 281 Ga. at 621 (noting relevance of the propounders' conduct). The propounder and his wife also participated in the preparation of the 2007 will. See *Bailey*, 280 Ga. at 529 (noting relevance of participation in the preparation of the purported will).

Furthermore, acting under the influence of the propounder and his wife, the testator secured a restraining order that prevented the caveator from seeing him for six months after the caveator returned from Florida, and the propounder made sure that the caveator was never left alone with their father again. See *Lillard*, 281 Ga. at 621 (noting relevance of isolating the testator and preventing unsupervised visits). Although the jury found that the testator had sufficient testamentary capacity, he was elderly and showing signs of declining mental acuity before the 2007 will was executed, and his symptoms had increased after his wife passed just a few weeks earlier. See *Cook v. Huff*, 274 Ga. 186, 187 (552 SE2d 83) (2001) (holding that "all of the circumstances including the conduct and demeanor of the parties with respect to each other, their comparative ages and mental capacity, and especially any physical and mental infirmity due to advanced age" may be considered).

Finally, the 2007 will radically changed the distribution of the estate envisioned by the testator's 2002 will, which would have divided the estate equally between the testator's two grown sons, to a scheme awarding 89% of the estate to the propounder and nothing to the caveator. See *Holland v. Bell*, 148 Ga. 277, 279 (96 SE 419) (1918) ("[W]here probate of the will is contested . . . for fraud and undue influence, 'it is always proper to inquire whether the provisions of the will are just and reasonable, and accord with the state of the testator's family relations, or the contrary.' " (citation omitted)). We therefore conclude that evidence regarding "the circumstances and surroundings of the testator and his associations" authorized the jury's finding that the 2007 will was the product of undue influence. See *Bowman*, 205 Ga. at 810.

(b) *Fraud*: There was also sufficient evidence to support the jury's finding that the will was procured by fraud. See *Edwards v. Shumate*, 266 Ga. 374, 375-376 (468 SE2d 23) (1996) ("The type of fraud that 'will invalidate a will must be fraud which operates upon

the testator, i.e., a procurement of the execution of the will by misrepresentations made to him. It exists only when it is shown that the testator relied on such a representation and was deceived.' " (footnote omitted)). The evidence showed that after the propounder and his wife encouraged the caveator and his wife to go on vacation in Florida, they embarked on a campaign to convince the testator that the caveator had stolen all his money, left him broke, and abandoned him by moving to Florida. These were misrepresentations, but they worked; the testator changed his will to disinherit the caveator completely. As a result of these misrepresentations, the propounder went into the meeting with the attorney who drafted the 2007 will intending to leave his entire estate to the propounder, and he would have done so were it not for the attorney's suggestion that he leave something to the caveator's children, who were the testator's grandchildren. Accordingly, we conclude that the evidence supports the jury's finding that the 2007 will was procured through "misrepresentation" and "fraudulent practices upon the testator's fears, affections, or sympathies." OCGA § 53-4-12.

3. The propounder's remaining enumerations of error challenge various evidentiary rulings by the probate court, which we review for abuse of discretion. See *Dorsey v. Kennedy*, 284 Ga. 464, 464 (668 SE2d 649) (2008).

(a) Relying on *Price v. State*, 220 Ga. App. 176 (469 SE2d 333) (1996), the propounder contends that the court abused its discretion by excluding as "continuing testimony" attorney Morris's contemporaneous, handwritten notes of his discussions with the testator, because the notes were a stronger grade of evidence than Morris's live testimony three years after the fact. The continuing witness rule prohibits the admission of notes by a non-party witness that are merely cumulative of the witness's testimony. See *Johnson v. State*, 244 Ga. 295, 296 (260 SE2d 23) (1979) ("Written documents . . . that substitute for testimony may not be taken into the jury room when the jury retires."). Morris refreshed his recollection with the notes and then testified from memory about the will discussions, making the contents of the notes cumulative. *Price* is inapposite, because in that case, the videotaped interviews were *not* cumulative of other testimony presented at trial. See 220 Ga. App. at 178. The probate court did not abuse its discretion by excluding the notes.

(b) The propounder claims that the probate court abused its discretion in excluding evidence of the caveator's rocky relationship with his daughter over the years, which would have helped the jury understand why the testator left her 10% of his estate while excluding the caveator entirely and shown the jury that the disposition of the estate was thoughtful and well reasoned based on the testator's current relationships. However, the probate court did not

exclude evidence of the bequest to the caveator's children, and the probate court's ruling did not prevent the propounder from introducing evidence of the testator's relationship with his grandchildren. The probate court merely prevented the propounder from mentioning tensions between the caveator and his daughter on the ground that it would have been unduly prejudicial. We cannot say that the probate court abused its discretion in this balanced ruling.

(c) The propounder maintains that the probate court abused its discretion by admitting evidence that starting in July 2007, six months after execution of the purported will, the propounder began using his fiduciary powers to convert the testator's property into the names of the propounder and the testator jointly, giving himself survivorship rights on real estate, bank accounts, certificates of deposit, and mutual funds. We disagree. This evidence undercut the propounder's claim that he believed that the caveator had stolen from the testator by convincing his father to add the caveator's name to his bank accounts prior the execution of the 2007 will. In addition, the jury could view the later transactions as evidence of a continuing course of conduct by the propounder of appropriating the testator's assets and treating them as his own, which started with the execution of the 2007 will and ended only when the testator died. See *Dorsey*, 284 Ga. at 464 ("[T]his Court has long adhered to the rule that 'relevant evidence about the . . . testator's state of mind at the time of the execution of the will includes testimony relating to a reasonable period of time before and after the execution of the will.' " (citations omitted)).

(d) The propounder argues that the probate court abused its discretion by admitting, in contravention of a pretrial ruling, the caveator's testimony that he stayed continuously with his mother until she died, that he slept on the couch while caring for her, and that the propounder stayed with her only four to six times, while barring the propounder's witnesses from testifying in rebuttal that the caveator's care of their mother was sub-par and contributed to the testator's decision to disinherit him. The probate court did not preclude all testimony involving who provided what care for the testator or his wife. Rather, the court ruled as follows:

> I don't have a problem with parties presenting evidence that different family members provided care for both parents, each son, other family members, but [I] don't want to get into the argument of somebody was a bad caretaker versus another party, somebody didn't spend enough time with a family member.

Evidence regarding whether, when, and for how long the caveator

took care of his mother demonstrated how odd it was that the caveator's father suddenly wanted him off the premises and out of the will entirely, and the propounder stated at the outset that he did not object to such testimony and confirmed this position during the trial. Thus, the court allowed the admission of relevant evidence and excluded testimony that it thought would get the trial off course and focus the jurors' attention on matters too far removed from the issues to be decided. We cannot say this was an abuse of discretion.

(e) The propounder argues that the probate court abused its discretion by admitting double hearsay from a witness who, when asked what the testator told her that the propounder had said about the caveator, responded, "[t]hat he had taken his money and went to Florida and was not coming back." The first level of hearsay — what the testator said to the witness — was admissible under the state-of-mind exception to the hearsay rule. See *Bailey*, 280 Ga. at 530 (holding that "such declarations are admissible 'for the purpose of showing the state of the testator's mind' " (citation omitted)). The second level of alleged hearsay — what the propounder said to the testator about the caveator — was not hearsay, because it was not introduced for the truth of the matter asserted, but rather for the effect it had on the testator. See *Miller v. State*, 275 Ga. 32, 36 (561 SE2d 810) (2002) ("[F]or such a purpose, the statements would not be hearsay as they were not offered for the truth of the matters asserted, but for the effect, or lack thereof, on the hearer."). Indeed, the caveator's theory of the case was that the statement by the propounder to the testator was *not* true, and the evidence was introduced to show where the testator got the misinformation. Consequently, the probate court did not abuse its discretion in admitting the witness's testimony. In any event, the alleged error would be harmless, because a similar statement by the propounder was admitted through the testimony of another witness without objection.

4. The evidence supports the jury's findings of undue influence and fraud, and the probate court's evidentiary rulings were not an abuse of discretion. Having ruled in favor of the caveator on the propounder's appeal, we need not address the issues raised in the caveator's cross-appeal, which is now moot.

*Judgment affirmed in Case No. S10A1497. Appeal dismissed in Case No. S10X1498. All the Justices concur.*

DECIDED MARCH 7, 2011.

*Friedman, Dever & Merlin, Hayes M. Dever, Genevieve H. Dame,* for Jerry McDaniel.

*Deming, Parker, Hoffman, Campbell & Daly, Paul M. Hoffman, Mary E. Robb*, for Charles McDaniel.